637 A.2d 886

**INDEPENDENT DISTRIBUTORS, INC., et al.**

v.

**Joseph J. KATZ, et al.**

**No. 902, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

March 1, 1994.

Shale D. Stiller (Larry P. Scriggins, Evelyn W. Pasquier and Piper & Marbury, on the brief and James E. Carbine and Weinberg and Green, of counsel), Baltimore, for appellants.

William R. Dorsey, III (Semmes, Bowen & Semmes, Alan Abramowitz and Nathan Patz, on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., and BISHOP and HARRELL, JJ.

BISHOP, Judge.

Appellees, Joseph J. Katz ("Katz") and Ernestine K. Feldman Wiesenfeld ("Wiesenfeld"), and other minority shareholders of Independent Distributors, Inc., formerly known as The Zamoiski Co. (the "Company"), filed a complaint in the Circuit Court for Baltimore City against appellants—the Company, the Waterview Land Co. Limited Partnership (the "Partnership"), and nine individuals who were shareholders, directors, or officers of the Company and partners in the Partnership. The trial court dismissed all of the plaintiffs from the case except Katz and Wiesenfeld. The court then held a bench trial on Katz and Wiesenfeld's shareholder derivative claim, which challenged certain transactions undertaken in 1984 and 1985. The trial court found that appellants, other than the Company, usurped a corporate opportunity of the Company and ordered "the appointment of a master/auditor to prepare an account to be stated on the aforesaid determination of right and to advise the Court on other appropriate remedies." Appellants filed a timely notice of appeal to this Court pursuant to Md.Cts. & Jud.Proc.Code Ann. § 12–303(3)(vi) (1989).

*Issue*

Appellants present the following question: "When the only evidence shows that a transaction between a Maryland corporation and its directors was fair to the corporation, may the minority stockholders set aside the transaction even when

they have made no effort and offered no evidence to show the transaction to be unfair?"

## Facts

In its memorandum opinion and order, the trial court provided a concise and cogent statement of the facts of this, and a related, action. That statement of facts, which the parties do not challenge, shall serve as the basis for ours, but at times, we shall add additional facts from the record, particularly with respect to the expert testimony of Ronald Lipman.

Joseph M. Zamoiski founded the Company. After the deaths of Mr. Zamoiski and his wife, ownership of the Company's stock was divided equally between Calman J. Zamoiski, Sr. and Irene Zamoiski Katz, the founder's children. Over the years, disputes arose between the Zamoiski family and the Katz family as to the proper management of the Company. At the same time, the Zamoiski family acquired a greater percentage of the Company stock than the Katz family. Years of disagreement and distrust have fueled a family feud, the battles of which have been waged in the court system for over a quarter of a century. Despite the ongoing feud, the Company remains a family-owned business. Presently, the Zamoiski family owns approximately seventy-one percent of outstanding shares of the Company's common and preferred stock; the Katz family owns the remaining outstanding shares.

### A. The 1967 Suit

The Katz family shareholders initiated an action in 1967 against the Company and some of the Zamoiski family shareholders pursuant to the Company's April 1967 recapitalization plan, which called for an exchange of one class of stock for several new classes of stock, with different options allowed to various shareholder groups. The Katz family invoked their statutory appraisal rights in order to determine the fair market value of their holdings so that payment for the stock could be sought from the Company. Following some initial pleadings, the suit lay dormant for many years, neither side requesting a trial or a dismissal of the action. Prompted by

the 1985 filing of the case *sub judice*, the Company and Calman J. Zamoiski, Jr. ("Calman, Jr."), two of the defendants in the 1967 action, filed a motion to stay the proceedings and a counterclaim for declaratory judgment in the 1967 case. The circuit court dismissed the 1967 complaint, but retained the counterclaim.

## B. *The Present Action*

In the instant case, the appellees alleged a breach of fiduciary duty by the Zamoiski family shareholders, who control the management of the Company by virtue of their majority stock ownership. Specifically, the appellees objected to a 1984–85 transaction under which the Company leased the land on which it built its office/warehouse complex from the Partnership, a limited partnership the Zamoiski family formed in order to purchase the real property on which the complex was developed. The parties disputed whether members of the Company's board of directors and Company officers, who participated individually in the limited partnership, usurped a business opportunity that properly belonged to the Company. The appellants defended by arguing that the transaction did not give rise to a corporate opportunity, that their actions were protected from judicial review by statute, and that the transaction was fair and reasonable to the Company.

## C. *The Waterview Transaction*

Prior to 1984, the Company operated out of facilities in West Baltimore and in Landover, Maryland; however, by 1984, the Landover facility had been condemned by the Washington Area Metropolitan Transit Authority as a part of the District of Columbia Metro project. Because it wanted to centralize its operations, the Company decided to dispose of its existing West Baltimore facility and consolidate its operations into a new, larger facility in the Baltimore area. Officials of Baltimore City (the "City") became aware of the Company's situation and suggested that the Company consider relocating to the Waterview area of the City because it is part of an enterprise zone in an urban renewal area. The

Company agreed to relocate to the Waterview area after the City agreed to provide favorable financing terms in the form of industrial revenue bonds ("IRB's") and an urban development grant ("UDAG").

### 1. *Advice of counsel and accountants*

After reviewing the proposed transaction with accountants, the Company outlined several important objectives to be met, including: (1) a tax-free exchange of property under § 1031 of the Internal Revenue Code; (2) minimization of financing costs; (3) minimal impact on the Company's financial statements; and, (4) maximization of financial and tax benefits to the Company's shareholders. The remaining issue was how to structure the deal in order to achieve the Company's objectives.

In a memorandum written in the early stages of the project, Tom Byers, an accountant for the Company, outlined the highlights and objectives of the transaction and pointed out potential exposures. One of these objectives was to have the CEO of the Company, "Buddy Zamoiski [Calman, Jr.] (via a partnership vehicle) own a 'part' of the new facility and lease it to [the Company] in order to personally benefit from the tax advantages of real estate ownership."

On August 2, 1984, Bennett Goldstein, the Company's outside accountant, and William Kitchel, the Company's financial officer, prepared a joint memorandum discussing the proposed transaction. One of the objectives stressed in the memorandum was maximization of the financial benefits that would pass through or accrue to the Company's shareholders. A handwritten note appended to this objective indicated that this was "not to [the] detriment of [the] Company." The authors of the memorandum expressed a preference that the transactions take place at the corporate level. They pointed out that appreciation of the real estate over an extended period of time may be one of three conceivable benefits to the shareholders. The memorandum concluded by outlining open questions, including: (a) "[h]ow much of the transaction should be struc-

tured at a partnership level" and (b) "[w]hat considerations shall be given to dissenting shareholders." The Company referred those and other questions to Mr. Goldstein and Jack Merriman of Weinberg and Green, counsel to the Company.

At a conference on August 13, 1984, the suggestion was made that a joint venture be formed with the Company, and a discussion followed as to what portion of the joint venture should be owned by the Company and what portion should be owned by individuals. In that context, the problem of minority shareholders' rights was raised and the conferees noted that the problem was "that minority [shareholders] all will want at least their proportion of [the joint venture]." Mr. Merriman noted that if there was a partnership formed without the Katz family participating and "they successfully attack it, what impact?" The answer noted was "Just back to place we started if [the Company] held it."

On August 22, Messrs. Goldstein and Merriman conferred. At that time, a suggestion was made that, although the City was to convey the land to the Company, the Company should swap that land to the Partnership as a capital item. Then the Partnership would either lease the land from the Company or purchase the land in an installment purchase. The notes from that meeting also indicate that Calman, Jr. was planning to place into the Partnership key management officials from the Company. It was also contemplated that the percentage ownership of each partner would be limited by the amount of tax shelter that was usable by the partners.

On August 27, 1984, Mr. Merriman advised Company officials that the building should be kept in the Company until the "turn over period or debt/equity ratio benefit" was really needed, then to "do [a] sale [and] leaseback (not necessarily with family [partnership] being buyer)."

In September 1984, the plan proposed to maximize benefits to individual shareholders was to allow the Zamoiski family, but not the Katz family, to acquire a direct interest in the project. The Company was to transfer ownership of the land to a joint venture made up thirty percent by a subsidiary of

the Company and seventy percent by the Zamoiski family shareholders. On September 6, however, Mr. Goldstein wrote a letter bringing to the attention of Company management that the Company would be foregoing substantial tax benefits if it permitted a partnership (that included individuals who could not make use of the tax benefits) to own the property. He concluded by stating his opinion that "this transaction best be carried out by the [Company]." Similarly, on September 7, Mr. Merriman wrote Calman, Jr., indicating that, at least initially, "financing should be taken in the name of the [Company] which would build and own the facility." Mr. Merriman explained:

> One of the chief reasons for my conclusion is, of course, the possibility of litigation by minority shareholders if the facility should be built and owned by a partnership comprised chiefly of stockholders other than the Katz family. The investment opportunity in such a partnership would be very attractive because it requires only a nominal capital contribution and affords the partners valuable tax advantages for at least the first five years and the long range probability of having purchased an appreciating type asset.

Further, on September 14, Coopers and Lybrand, special accountants for the Company, wrote the Company, suggesting that "the Company should consider development and use of the Waterview Project within [the Company]."

Dissatisfied with these opinions, Calman Jr. sought the advice of Jacques Schlenger, Esquire. On October 10, Mr. Schlenger sent an outline of a proposed structure for the transaction. That proposal called for a partnership (comprised of the Company's shareholders) to purchase the property and lease it, or some portion thereof, back to the Company. As Mr. Schlenger contemplated the transaction, all shareholders of the Company would be entitled to become partners in the Partnership, as both general and limited partners, in proportion to their interests as shareholders in the Company. The dominant factor in Mr. Schlenger's recommendation was estate planning. He sought to achieve significant estate tax savings for the Zamoiski family through the use of a "capital

freeze" partnership. Specifically, the Zamoiskis would "control the operation of the Partnership and have the opportunity to shift the future income and appreciation attributable to the Land to other persons (probably younger generation members of the Zamoiski family)."

### 2. *The Debt–to–Equity Ratio*

Maintaining a favorable debt-to-equity ratio (the ratio of the debt shown on the Company's balance sheet to the stockholders' equity) was asserted to be of particular concern to the Company. The Company is a high-volume wholesaler and distributor of consumer goods; from 1984 to the end of the 1980s, it regularly dealt with 600 to 800 manufacturers and suppliers per year. John Mulkey, the Company's Treasurer, testified that the Company relies on open lines of credit from its suppliers to give it an interest-free period after receipt of merchandise before it must pay the supplier's invoice. According to Mr. Mulkey, being forced into a C.O.D. arrangement with its suppliers would be detrimental to the Company. Because the Company's suppliers weigh the Company's debt-to-equity ratio as a primary factor in approving open lines of credit, the Company was concerned that it maintain a favorable ratio at all times.

The record further discloses, however, that, although suppliers generally investigate a company's financial stability and request financial information before approving credit lines, the Company is privately-held, and, with few exceptions, does not release its full audited financial statements (which would reveal the true nature of the transaction and the Company's obligation as guarantor) to its suppliers. During the period in question, the Company's full financial statements, with auditors' notes, were given to only three of its suppliers, which collectively represent less than twenty percent of the Company's outstanding obligations.

### 3. *The Agreement*

In December 1984, the Partnership executed a Land Disposition Agreement (the "Agreement") with the City for the

acquisition of several parcels of land (hereinafter referred to as "the Waterview Property"). At the same time, through IRB and UDAG financing and its own outlay of money, the Company began construction of its office/warehouse complex on the Waterview Property at a cost of approximately $14,-000,000. The Waterview Property was transferred by deeds to the Partnership in March and September, 1985. The consideration for the property was $2,400,000, all of which was financed by three purchase money mortgages taken back by the City. The executed mortgages were signed by both the Partnership as owner and the Company as developer. Guarantees signed in connection with promissory notes were also signed by the Company. As the deal was structured, none of the individual partners was liable for the debts of the Partnership; instead, the Company undertook ultimate responsibility for both the construction of the warehouse and the servicing of the debt on the Waterview Property.

In return for its obligations, the Company received a thirty year lease with a five year option on the Waterview Property. The term of the lease exceeds the span of the mortgage. The lease agreement sets forth rental payments to the Partnership that correspond to payments owed to cover the mortgage debt. At the end of the lease term, the Partnership will own the warehouse and fixtures the Company constructed. According to testimony at trial, the Partnership benefits from the transaction because it acquires any appreciation in the real estate that occurs during the term of the leasehold (upon the expiration of the lease, the property, and the improvements thereon, are expected to be worth an estimated $33 million). The Company benefits because it does not have the debt liability of the land purchase on its financial statements and can walk away in thirty years if the deal turns out to be a "white elephant." Although the purchase price of the Waterview Property was $2,400,000, which was the total face amount of the promissory notes to the City, all payments of principal and interest under the notes were deferred for five years, and the interest that accrued during the five-year period was added to the principal balance due at the beginning of the

sixth year. Because of the interest accrual, the liability that would have been reflected on the balance sheet if the Company had purchased the land would have been approximately $3,000,000.

At the time of the Agreement, the Partnership was comprised of one general partner and two classes of limited partners. Class A limited partners held an aggregate eighty-one and one-half percent interest in the Partnership. Class A limited partnership interests were offered to all of the Company's shareholders, including the Katz family shareholders, in proportion to what would have been their stock interests in the Company as of the time the 1967 suit was initiated. Class B limited partners were to hold an aggregate seventeen and one-half percent interest of the Partnership. Class B limited partnership interests were offered to key upper-level management employees who were not family members and who did not hold stock in the Company. Each employee who participated in the plan received a two and one-half percent interest in the Partnership. Calman, Jr. became the general partner and received a one percent interest in the Partnership.

### 4. *Offer to Katz Family Shareholders*

In October 1984, prior to the formation of the Partnership, the Katz family shareholders were contacted through counsel and notified of the proposed transaction and its structure. The Katz family shareholders were offered the opportunity to participate as limited partners in the Partnership on a pro rata basis with the other shareholders of the Company; however, the structure of the proposed transaction was essentially presented to them as a *fait accompli*. The Katz family shareholders did not respond to the proposal at that time. In April 1985, counsel for the Zamoiskis and the Katzes met again to discuss whether the Katz family shareholders planned to participate as limited partners in the Partnership. At that time, the Katzes were supplied with copies of the key transaction documents. A few weeks later, the Katz family shareholders informed counsel that they would be declining the

offer to participate in the Partnership and raised their objection to the overall transaction.

### D. *Testimony of Ronald Lipman*

Appellants called Mr. Lipman, an expert in the field of real estate appraisal, to render his opinion regarding the "fairness" of the lease to the Company. Mr. Lipman's testimony, which was uncontradicted, focused on a comparison of the fair market value of the land in fee simple as of December 1984, with the present value as of the same date of the Partnership's "leased fee position" in the property, *i.e.*, the present value of (1) the Partnership's right to receive a thirty-five year stream of rental payments for the Waterview Property, plus (2) the reversion of the *improved* property at the end of the lease term (taking into account appreciation and depreciation).

Mr. Lipman valued the land in fee simple at $2,260,000 as of the valuation date, but testified that the present value of the Partnership's leased fee position was between $1,840,000 and $2,175,000. Based on that comparison, Mr. Lipman concluded that the Company's lease obligation was below fair market value. The following colloquy ensued:

Q: And in this hypothetical exercise I have you doing here, in December of 1984, if you were advising the [Partnership] about the investment value of the Waterview lease, what would your advice be?

A: To try to negotiate an increased rent, either an increased rent in one of the two segments in which rent is being paid, or to negotiate some rent during the first five-year period when no rent had been paid. In order to balance the fee simple value against the leased fee value, more rent had to be paid under the contract.

THE COURT: But in a sense that would [sic] an asset to the [Company]—I mean the ... Company basically is paying less than it should pay, is what you're saying, to the partnership.

THE WITNESS: When everything is compared on an apples-to-apples basis, that's correct.

THE COURT: And you said [the Company] has a, quote, sweetheart kind of lease?

THE WITNESS: It's called a leasehold advantage.

THE COURT: But the advantage is the shareholders are Zamoiskis [sic], the detriment being the partnership of Waterview. That's the bottom line. I just want to make sure I—

THE WITNESS: Yes.

THE COURT: Okay.

E. *The Trial Court's Opinion*

In its memorandum opinion and order, the trial court concluded that (1) Md.Corps. & Ass'ns Code Ann. (hereinafter "CA") § 2–405.1, Maryland's codification of the business judgment rule, was inapplicable because the facts in this case implicated the directors' duty of loyalty, rather than their duty of care; (2) CA § 2–419, Maryland's interested director statute, was inapplicable because the lease transaction between the Company and the interested directors and officers, *i.e.*, the Partnership, was "merely collateral to and a necessary byproduct of the disputed land transaction"; (3) the "overarching concern in all corporate opportunity cases is whether the taking of the opportunity was fair to the corporation"; (4) the opportunity to purchase the Waterview Property belonged to the Company and "the placing of all financial liability on the Company, without the benefit of ultimate ownership ... [was] generally unfair to the Company and its shareholders"; (5) a waiver of the corporate opportunity was impossible because "[a]ll of the voting shareholders at the time of the events were members of the Zamoiski family, as a result of the still pending 1967 suit filed by all Katz family stockholders and the charter provision establishing no voting rights for preferred stockholders," *see* Md.Corps. & Ass'ns Code Ann. § 3–204 (1993) (stockholder who demands payment for stock under the appraisal statute "[c]eases to have any rights of a stockholder with respect to that stock, except the right to receive payment of its fair value"); and, (6) the defendants' offer to the

plaintiffs of an interest in the Partnership was not a legally sufficient substitute for waiver of the corporate opportunity.

Additional facts will be included in the discussion, *infra.*

## Discussion

Appellants argue that (1) management's decision to preserve the debt-to-equity ratio has never been challenged and is protected by the business judgment rule; (2) the facts establish only an interested director transaction, and because the evidence convincingly demonstrates the fairness of the transaction to the Company, the court may not set it aside; (3) the corporate opportunity doctrine does not apply under the facts of this case because the Partnership transacted business with the Company directly and did not take or usurp the corporation's ability to use the Waterview Property; and, (4) even if the corporate opportunity doctrine applies, it was not breached in this case because the transaction was fair to the Company.

Appellees, on the other hand, argue that (1) there was substantial evidence to support the trial court's finding that appellants usurped a corporate opportunity of the Company because the opportunity was in the Company's line of business, the Company had an interest and expectancy in the opportunity, the appellants came upon the opportunity in their capacity as officers, shareholders, or directors, and the Company's assets were used to obtain and develop the opportunity; (2) the Company did not waive the opportunity and the Company had the means to obtain the opportunity itself; (3) the usurpation of the corporate opportunity was unfair to the Company; and, (4) neither CA § 2–419 nor CA § 2–405.1 shields the appellants from attack.

At the heart of this controversy is whether the disputed transaction is properly characterized as an "interested director transaction" or a "corporate opportunity," and what standard of review applies. Before we turn to the specifics of this case, we shall review briefly the scope of review and the applicable law.

A. *Scope of Review*

Rule 8–131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In *Goodwin v. Lumbermens Mut. Casualty Co.,* 199 Md. 121, 129, 85 A.2d 759 (1952), the Court of Appeals explained that

[b]efore a determination can be made that [a factual finding] is clearly erroneous, the evidence must be viewed in a light most favorable to the prevailing party below. If, viewed in that light, there is substantial evidence to support the factual conclusion, then the appellate court should accept that conclusion. But if there is no such substantial evidence, then the conclusion may be designated as arbitrary, and may be disregarded.

Put another way, "in reviewing the lower court's findings, our function is not to determine whether we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence to support the trial court's findings." *Mercedes–Benz of N. Am., Inc. v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993).

B. *Interested Director Transactions*

"At common law, a transaction between a corporation and one or more of its directors was either void or voidable and could be rescinded in a stockholder's suit. In reviewing these transactions, the courts leaned heavily on fiduciary principles developed in the law of trusts." James J. Hanks, Jr., *Maryland Corporation Law* § 6.22[a], at 211 (Supp.1992); *see, e.g., Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co.,* 16 Md. 456 (1860). CA § 2–419, however, " 'rejects the common law view that all conflict of interest transactions entered into by directors are automatically voidable at the option of the corporation without regard to the fairness of the transaction

or the manner in which the transaction was approved by the corporation.'" Hanks, *supra*, § 6.22[b], at 213 (*quoting* Model Business Corp. Act § 8.31, Official Comment (1984)). That section provides in pertinent part:

(a) *General rule.*—If subsection (b) of this section is complied with, a contract or other transaction between ... a corporation and any other corporation, firm, or other entity in which any of its directors is a director or has a material financial interest is not void or voidable solely because of any one or more of the following:

(1) The common directorship or interest;

(2) The presence of the director at the meeting of the board or a committee of the board which authorizes, approves, or ratifies the contract or transaction; or

(3) The counting of the vote of the director for the authorization, approval, or ratification of the contract or transaction.

(b) *Disclosure and ratification.*—Subsection (a) of this section applies if:

(1) The fact of the common directorship or interest is disclosed or known to:

(i) The board of directors or the committee, and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum; or

(ii) The stockholders entitled to vote, and the contract or transaction is authorized, approved, or ratified by a majority of the votes cast by the stockholders entitled to vote other than the votes of shares owned of record or beneficially by the interested director or corporation, firm, or other entity; *or*

(2) ***The contract or transaction is fair and reasonable to the corporation.***

Md.Corps. & Ass'ns Code Ann. § 2–419 (1993) (emphasis added).

Where, as in this case, there are no disinterested directors or stockholders, the interested directors bear the burden of proving that the transaction is fair and reasonable to the corporation. *See* CA § 2–419(d)(1) (1993).

> The word "fair" means that the material terms of the transaction are within the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length with knowledge of all material facts known to any party to the transaction. The word "reasonable" means that it makes sense for the corporation to enter into the transaction.

Hanks, *supra*, § 6.22[b], at 216 (footnote omitted). Whether the transaction is fair and reasonable to the corporation "is basically a factual determination and the lower court's findings will not be disturbed unless clearly erroneous." *Cummings v. United Artists Theatre Circuit, Inc.*, 237 Md. 1, 26, 204 A.2d 795 (1964).

## C.  *Corporate Opportunity Doctrine*

"Under the 'corporate opportunity' doctrine, corporate personnel are precluded from diverting unto themselves opportunities which in ***fairness*** ought to belong to the corporation." *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 45 n. 5, 382 A.2d 564 (1978) (emphasis added) (*see also* cases and secondary authority cited therein). In the oft-cited case of *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503, 511 (1939) (cited in *Maryland Metals* ), the Supreme Court of Delaware explained that

> if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed,

the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired.

*See also Billman v. Maryland Deposit Ins. Fund Corp.*, 86 Md.App. 1, 17, 585 A.2d 238, *cert. denied*, 323 Md. 1, 590 A.2d 158, *and cert. denied*, —— U.S. ——, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991).

There are three generally recognized tests for determining whether an opportunity belongs to the corporation: "the 'line of business' test, the 'interest or expectancy' test, and the 'fairness' test." 3 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 861.1, at 283 (perm. ed. rev. vol. 1986). The Court of Appeals appears to have adopted the interest or expectancy test. *See Faraclas v. City Vending Co.*, 232 Md. 457, 463, 194 A.2d 298 (1963) ("[W]hen presented with a business opportunity to fulfill a corporate purpose, [an officer or director] should take advantage of it, not for himself, but for the corporation."); *Poole v. Miller*, 211 Md. 448, 459–60, 128 A.2d 607 (1957) (" 'Generally, it is held that the directors or officers of a corporation are not ... precluded from entering into and engaging in a business enterprise independent from, though similar to, that conducted by the corporation itself, provided that in doing so they act in good faith and do not interfere with the business enjoyed by the corporation.' "); *Acker, Merrall & Condit Co. v. McGaw*, 106 Md. 536, 68 A. 17 (1907); *see also* 62 Op. Att'y Gen. 804, 808 (Md.1977). The interest or expectancy test "focuses on whether the corporation could realistically expect to seize and develop the opportunity. If so, the director or officer may not appropriate it and thereby frustrate the corporate purpose." Hanks, *supra*, § 6.23, at 219.

There are instances when the corporate opportunity doctrine will not apply, even where the opportunity falls within the corporation's interest or expectancy. *See, e.g., Maryland Metals, Inc.*, 282 Md. at 46–47, 382 A.2d 564 (where corporation makes clear its lack of interest or abandons previously

expressed interest). *See generally* Hanks, *supra,* § 6.23; Fletcher, *supra,* § 862. The linchpin of the rule and the exceptions is fairness and reasonableness to the corporation. Thus, not unlike the case of interested director transactions where there are no uninterested directors or shareholders, the burden is on the interested parties to demonstrate the fairness and reasonableness of the transaction. That determination is "largely a question of fact to be determined from the objective facts and surrounding circumstances existing at the time the opportunity arises." Fletcher, *supra,* § 861.1, at 286.

## D. *The Purchase of the Waterview Property*

Appellants argue that the purchase of the Waterview Property and the lease of that property to the Company must be examined under the microscope of the interested director statute. Appellants claim that the corporate opportunity doctrine does not apply because, in the end, the Company has full enjoyment of the property through a lease that is fair and reasonable to the Corporation. Finally, appellants contend that the directors' decision to realize the current benefit of a favorable debt-to-equity ratio rather than to preserve the speculative benefit of owning the Waterview Property thirty-five years in the future is protected by the business judgment rule. Appellants' myopic view of the transaction is unpersuasive for several reasons.

We agree with the trial court's conclusion that the lease between the Partnership and the Company was "merely collateral to and a necessary by-product of the disputed land transaction." Although the lease arrangement, by itself, is subject to examination under CA § 2-419, for purposes of a corporate opportunity analysis, it also has to be examined as part of the overall transaction and not in isolation.

Although Mr. Lipman's uncontradicted testimony establishes that the lease transaction was a "sweetheart" deal for the Company, *i.e.,* the Company had a leasehold advantage, that testimony is not probative of whether the Partnership's acquisition of the property was fair and reasonable to the Company.

Mr. Lipman never testified that the entire transaction (meaning the purchase of the property and the lease) was fair to the Company. When appellees' counsel asked that question, appellants' counsel objected and the trial court sustained the objection because the subject matter of the question was beyond Mr. Lipman's area of expertise. This is the most probable explanation of why the trial court did not refer to Mr. Lipman's testimony in its written opinion. Alternatively, even if Mr. Lipman's testimony was relevant to the fairness of the purchase of the property, the trial court was free to reject Mr. Lipman's testimony because it was merely uncontradicted, and not uncontested. *See Yost v. Early,* 87 Md.App. 364, 381, 589 A.2d 1291, *cert. denied,* 324 Md. 123, 596 A.2d 628 (1991) (the trier of fact may disbelieve a witness even when uncontradicted).

Appellants had the burden of proving the fairness and reasonableness to the Company of the acquisition of the property, but they failed to sustain that burden. No expert witness testified that the Partnership's purchase of the property was fair to the Company. In fact, the overwhelming weight of the evidence demonstrates that the transaction was not fair to the Company. Appellants admitted that the Company had the financial capability to acquire for itself the Waterview Property. None of the partners contributed capital to the Partnership, nor were they personally liable for the debts of the Partnership. The Company spent approximately $14 million to improve the property and also guaranteed the mortgages on the property. In the end, however, it was the Partnership that would own the property, including the improvements thereon, which, according to Mr. Lipman, would then be worth an estimated $33 million. It is clear that when Mr. Lipman compared the fair market value of the land in fee simple as of December 1984 with the present value as of the same date of the Partnership's "leased fee position" in the property, and concluded that the lease was a "sweetheart" deal to the Company, he did not factor into the equation the $14 million the Company expended to improve the property, the risk the Company took in guaranteeing the Partnership's

mortgages, and the windfall the partners may receive after the expiration of the lease.

Appellants attempt to justify this imbalance based on the perceived benefit to the Company of preserving a favorable debt-to-equity ratio on its balance sheet. The fact remains, however, that the debt the Partnership incurred to purchase the property represents only approximately fifteen percent of the total debt incurred to purchase and develop the Waterview Property. The $14 million debt the Company incurred to improve the property certainly affected the Company's debt-to-equity ratio, and any benefit to the Company resulting from the Partnership's acquisition of the property is infinitesimal by comparison. Based on the evidence adduced during trial, we cannot conclude that the trial court was clearly erroneous when it concluded that appellants' purchase of the property was unfair to the Company.

Contrary to appellants' assertion, CA § 2–405.1 (the codification of the business judgment rule) does not control. The duty of care and the duty of loyalty are two independent duties directors owe the corporation. The corporate opportunity doctrine is a function of the director's duty of loyalty to the corporation, rather than his duty of care. When the General Assembly codified the business judgment rule "it did not intend to abrogate the fiduciary duty imposed upon a director or officer not to usurp a corporate opportunity." 62 Op. Att'y Gen. 804, 812 (Md.1977). Thus, appellants cannot seek shelter under the umbrella of the business judgment rule.

Appellants' siren-like admonition that, if this Court were to uphold the trial court's judgment, "hundreds, if not thousands, of normal leasing transactions entered into by Maryland corporations for many years would suddenly become illegal," is fallacious. The finding that the appellants usurped a corporate opportunity is not based on the fairness *vel non* of the lease with the Company; rather, it is predicated on the

appellants' usurpation of the Company's interest or expectancy in acquiring the property for itself. Although the Company will have the benefit of a leasehold interest for thirty-five years, the appellants usurped the Company's interest or expectancy in acquiring the fee simple interest in the property. Had the Partnership, for example, preexisted the Company, and the Partnership, prior to the Company's formation, owned the Waterview Property, it is quite possible that the trial court could have sustained the lease transaction as fair and reasonable to the Company under CA § 2–419. Alternatively, had the transaction been structured so that all of the partners contributed capital to the Partnership, the Partnership contributed to the cost of the property's improvements, and one or more general partners assumed personal liability for the mortgages without any guarantee by the Company, the trial court may have been able to conclude that the Partnership's purchase of the property was fair and reasonable to the Company, particularly in light of the Company's desire to maintain a favorable debt-to-equity ratio. Those facts, however, were not before the trial court, and are not before us on appeal.

Although most corporate opportunity cases involve a renegade director, officer, or high-level employee who competes with the corporation, usurps the corporation's ability to use certain property, or deprives the corporation of the ability to use an asset by violating an express corporate policy, *see, e.g., Acker, Merrall & Condit Co.,* 106 Md. 536, 68 A. 17; *Guth,* 5 A.2d at 503, we are satisfied that the facts of this case amount to a usurpation of a corporate opportunity, albeit carried out in a somewhat more subtle fashion. Our holding does not establish a "per se" rule, as asserted by appellants. Directors of a closely held corporation will still be able to purchase property and lease it to the corporation, but only where the lease is fair and reasonable to the corporation *and* where the directors' purchase of the property is fair and reasonable to the corporation.

Our holding is in accord with *American Metal Forming Corp. v. Pittman,* 135 B.R. 782 (D.Md.1992). In that case, Pittman, the President of Pittcon Industries, Inc., a company

engaged in the manufacture of woods, metals, drywall, and finishings, decided that the company should expand. While acting in his capacity as President, Pittman came across suitable properties for the planned expansion. It was admitted that the company had the financial ability and the need to purchase those properties; nevertheless, Pittman and his wife purchased the properties, as well as certain equipment, with IRB financing and pledged the corporation's assets as security. Pittman then leased the properties and equipment back to Pittcon. The court held that the "purchase of the properties and equipment were clearly corporate opportunities which Pittcon could have purchased on its own under the same favorable terms Pittman obtained for himself." *Id.* at 786.

Although the court in *Pittman* deemed the terms of the lease unfair to the corporation, it is clear from the opinion that Pittman's breach of fiduciary duty by requiring Pittcon to enter into an unfavorable lease was a wrong above and beyond the usurpation of a corporate opportunity.

> The purchase of the properties and equipment were clearly corporate opportunities which Pittcon could have purchased on its own under the same favorable terms Pittman obtained for himself. Pittman came across those opportunities as President of Pittcon, and usurped the corporate opportunities for himself. He *also* breached his fiduciary duty to Pittcon when he caused Pittcon to enter into leases with himself at above the market rate. . . .

*Id.* (emphasis added). Thus, the mere taking of the properties by the President in *Pittman* constituted the usurpation of a corporate opportunity quite apart from the fairness of the leases.

Appellants cite *Poole v. Miller*, 211 Md. 448, 128 A.2d 607 (1957), and argue that that case is controlling in the case *sub judice*. We disagree. In *Poole*, shareholders of a building and loan association sued the association's President in order to recover profits that the President made in transactions growing out of the association's business. Specifically, the President acquired ground rents at the same time the associa-

tion made mortgage loans on the leasehold interests. Holding that the President had not usurped a corporate opportunity, the Court of Appeals stated:

> The appellants strongly attack the practice under which [the President] took ground rents and the Association took mortgages on the leasehold interests in the same properties. Usually, existing ground rents were replaced by newly created ones with [the President] as the lessor, and the amounts of the new rents did not exceed the old. . . . The possibilities of abuse in such a practice require no elaboration, but the evidence does not support an inference that the Association has thereby suffered loss or that [its President] has profited at the expense of the Association. There was testimony to show that the Association did not wish to buy ground rents, and it appears to have been the established policy of [the Association] to lend on the security of mortgages on leasehold, rather than fee simple property.

*Id.* at 458–59, 128 A.2d 607. Thus, the Court held that the President did not usurp a corporate opportunity because the association did not have an interest in or expectation of acquiring the ground rents, and therefore did not suffer as a result of the President's actions. In other words, the President's actions were not unfair to the association. In stark contrast, the Company did have an interest in or expectancy of obtaining a fee simple interest in the Waterview Property and the trial court's finding that the transaction was unfair to the Company was not clearly erroneous.

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**