### TOBACCO TECHNOLOGY, INC.

v.

### TAIGA INTERNATIONAL N.V., et al.

**Civil Action No. CCB–06–563.**

United States District Court,
D. Maryland.

June 16, 2009.

---

Thomas M. Wilson, III, Gregory Michael Garrett, Tydings and Rosenberg LLP, Baltimore, MD, for Plaintiff.

Charles R. Claxton, Garson Claxton LLC, Stanley J. Reed, William Alexander Goldberg, Lerch Early and Brewer Chtd., Bethesda, MD, Boyd Tristan Cloern, Leiv Hamilton Blad, Bingham McCutchen LLP, Washington, DC, for Defendants.

## MEMORANDUM

CATHERINE C. BLAKE, District Judge.

Now pending before the court are two motions for summary judgment, one filed by defendants Taiga International N.V. ("Taiga") and Marie Paul Voûte, and one filed by defendant Thomas J. Massetti. Plaintiff Tobacco Technology, Inc. ("TTI") has sued Taiga for breach of contract and breaches of agent's duties (Counts I and II, respectively), Mr. Massetti for breach of director duties (Count III), and Taiga and Mr. Voûte for aiding and abetting Mr. Massetti's alleged breach and for misappropriation of trade secrets (Counts IV and V, respectively). In its proposed first amended complaint, TTI also seeks a declaration by this court, pursuant to 28 U.S.C. § 2201, as to its rights and obligations under an alleged 2000 agreement between it and Taiga (Count VI).[1] For the

1. TTI has moved for leave to file an amended complaint that (a) raises additional claims against Mr. Massetti in Count III (*see* First Amended Compl. ¶ 68(c), (f), (g), & (h)); (b) includes Mr. Massetti for the first time as a defendant in its misappropriation claims in Count V (*see id.* ¶¶ 82–85); and (c) adds the aforementioned Count VI (*see id.* ¶ 89). Defendants do not object to the proposed amendments except as they relate to Mr. Massetti. (*See* Taiga S.J. Mot. at 1 n. 1; Massetti S.J. Mot. at 1 n. 1.) This motion will be granted in part and denied in part.

"Disposition of a motion to amend is within the sound discretion of the district court." *Deasy v. Hill,* 833 F.2d 38, 40 (4th Cir.1987) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). While Rule 15(a)(2) encourages the court to freely grant leave to amend "when justice so requires," such leave is not to be given automatically. *Deasy,* 833 F.2d at 40. A court may properly deny a motion for leave to amend where the motion was unduly delayed and would unduly prejudice the non-movant if granted. *Id.; see Foman,* 371 U.S. at 182, 83 S.Ct. 227. The present motion, which TTI claims is necessitated by information learned no later than the date of its August 27, 2008 deposition of TTI flavorist Brian Hawking, was filed over two months after that date, and nearly seven months after the close of general fact discovery on April 18, 2008. (In his April 7, 2008 letter order (docket entry no. 85), Magistrate Judge Paul Grimm had extended the fact discovery deadline "for the limited purpose of permitting Mr. Hawking's deposition to be conducted after the current discovery cut-off.") TTI attempts to excuse its delay by describing many previous delays by defendants (*see* Reply to Mot. to Amend at 6–8), however this recounting fails to explain the lag between the Hawking deposition and the filing of this motion. Accordingly, the court finds the motion to be unduly delayed. *See Deasy,* 833 F.2d at 41 (finding undue delay where over two months passed between plaintiff's learning of new claims and his seeking leave to amend his complaint); *Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons,* 358 F.Supp.2d 475, 481 n. 3 (D.Md.2005) (finding undue delay where over two months passed between plaintiff's learning of new claims and its seeking leave to amend).

Moreover, the present motion, insofar as it seeks to add Mr. Massetti as a defendant to Count V, would unduly prejudice him. Mr. Massetti has so far prepared his entire defense, as he is entitled to do, on the understanding that he was only being accused of

reasons stated below, the defendants' motions for summary judgment will be granted.[2]

## BACKGROUND

Maryland-based TTI manufactures and sells flavors for tobacco products sold by tobacco companies all over the world. From its founding in 1975, TTI was overseen by Duke Cassels–Smith. When he died in 1987, his wife Jeremy Cassels–Smith became president of TTI and chairwoman of its board. Because Ms. Cassels–Smith admittedly had little experience in the tobacco business, she searched for another person to become TTI's president soon after taking on the position. In 1991, Ronald Whitehead, a professional with over ten years of experience in the tobacco industry, was hired to be TTI's president and a shareholding member of its board of directors ("board"). Ms. Cassels–Smith retained the position of chairwoman and, at the time of Mr. Whitehead's hiring, TTI's board also passed a resolution appointing her TTI's Chief Executive Officer ("CEO").

According to TTI's bylaws, Mr. Whitehead, as TTI's president, had "the responsibility for the active management of the business and general supervision and direction of all of the affairs of the Corporation." (Taiga S.J. Mot. at App. 130, TTI Bylaws Art. III, § 3.) To carry out this active management, Mr. Whitehead had the express authority to execute documents requiring signature of an executive officer on TTI's behalf.[3] (*Id.*) This Mr.

breaching fiduciary duties, not misappropriating trade secrets, given that he was not named in the original misappropriation charge. *See Deasy*, 833 F.2d at 41. Allowing Mr. Massetti to be added to Count V at this late date would potentially require reopening discovery to allow for additional depositions or re-depositions of witnesses. For example, Mr. Massetti did not send an attorney to depose Mr. Hawking because, at the time Mr. Hawking was deposed, Mr. Massetti had not been accused of any impropriety with respect to him. The attorney for Taiga and Voûte—who stood in for Mr. Massetti's attorneys—only asked two questions about Mr. Massetti's role during the entire deposition. Therefore, Mr. Hawking, a foreign witness, would likely need to be re-deposed by an attorney for Mr. Massetti, creating procedural and financial difficulties. Accordingly, the court finds the motion to be unduly prejudicial with respect to its addition of Mr. Massetti to Count V. *Cf. id.* (leave to amend a complaint to include a new issue was properly denied when motion was made after close of discovery, prejudicing discovery on the new issue).

TTI argues that no new depositions or re-depositions need to be conducted because the evidence undergirding their proposed amendment to Count V came from Mr. Massetti's own deposition; therefore, there is no undue prejudice to Mr. Massetti here. (Reply to Mot. to Amend at 10.) Accepting TTI's argument, which the court does not, would only

further highlight the undue delay of their motion, since Mr. Massetti's deposition was conducted on March 20, 2008, over seven months before the motion was filed.

For the foregoing reasons, TTI's motion for leave to file an amended complaint will be denied with respect to its new misappropriation claims against Mr. Massetti and all related references, and granted with respect to its remaining amendments. All citations to the complaint in this memorandum opinion will therefore be made to the first amended complaint.

2. TTI also has filed motions to seal (a) its reply memorandum in support of its motion for leave to file an amended complaint; and (b) certain exhibits included in its appendix in support of its oppositions to defendants' motions for summary judgment. No objections have been raised to these motions and they appears justified, in light of the sensitive material contained therein. Thus, these motions will be granted.

3. The bylaws state that the chairwoman of TTI's board is only responsible for "the implementation of the policies determined by the Board of Directors and for the administration of the business affairs of the Corporation." (*Id.* at Art. III, § 2.) Ms. Cassels–Smith described her responsibilities in this role as being those of a "[n]ag. Actually I just wanted to be kept informed about everything. That's

Whitehead did on occasion, for example by purchasing facilities for TTI's use. Otherwise, it appears that much of the business Mr. Whitehead conducted on behalf of TTI was done more informally. It also appears that Ms. Cassels–Smith generally deferred to Mr. Whitehead for corporate decisions.[4]

The major set of TTI business transactions relevant to the present dispute are those with Taiga. Taiga is a Belgium-based manufacturer and seller of flavors for both tobacco products and food products. It was formed in 1992 by directors of TTI and Craftmaster Flavor Technology, Inc. ("Craftmaster"), a New York-based manufacturer and seller of flavors that supplies flavor compounds for TTI's use in its tobacco flavors and other companies' use in food flavors. Craftmaster's president and chairman of its board of directors at all times relevant to this dispute was Mr. Massetti, who was also a board member of TTI from 1993 until 2003. At the time of Taiga's formation, Mr. Massetti, Mr. Whitehead, Ms. Cassels–Smith, her son George Cassels–Smith, and Mr. Voûte all purchased shares in Taiga, and they all continue to possess shares in Taiga. Mr. Voûte was appointed general manager of Taiga[5], and Mr. Massetti was named chairman of its board, posts that they both retain to this day.

There were several goals in forming Taiga. One was to allow Mr. Voûte to sell off inventory in his previous company, which had recently gone bankrupt; another was to introduce Craftmaster's flavors and TTI's flavors into the European market; and yet another was to help Craftmaster and TTI avoid various duties imposed upon American-originated flavor products. In furtherance of the TTI-related goals, TTI and Taiga eventually began a commercial relationship in 1996. In this relationship, TTI would sell finished tobacco flavors to Taiga at a profit, and Taiga would repackage them, re-label them as Taiga products, and sell them to customers in the European region (also at a profit), giving TTI a percentage commission from the completed sales; thus, TTI would be paid twice for each set of transactions.[6] This arrangement, which was performed for several years, was not memorialized in any formal contract.[7] At times the arrangement was

---

all I did." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, Jeremy Cassels–Smith ("JCS") Dep. at 19.) The bylaws make no mention of the responsibilities of the CEO.

4. When asked in her deposition about Mr. Whitehead's decisions during the twelve years he was president while she was chairwoman, she replied: "I don't know how many decisions there were or what import. I know very little. I kept at arm's length from that whole thing." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 136.)

5. This position was the highest executive position at Taiga, and thus was the functional equivalent of president. As Mr. Voûte himself describes it, being managing director meant that "the daily running of Taiga" was left "entirely" to him. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 81.) At times Mr. Voûte refers to himself as president of Taiga. (*See id.* at 109.)

6. In practice, Taiga's two payments—one for the TTI flavors and one for the commission on their sale to a third party—usually would be made after Taiga had sold the repackaged flavor. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 66–68.)

7. Indeed, at one point in 1998, when Mr. Voûte expressed concern that there was no written contract between the two companies, Mr. Whitehead appears to have responded: "Don't be concerned about your written agreement with TTI as we have a clear verbal understanding." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. L, Timeline at 3). Elsewhere Mr. Voûte described the initial commercial relationship between Taiga and TTI as "an unwritten agreement or a gentlemen's agreement between Ron Whitehead, TTI's president, and myself that Taiga would act as the distributor for TTI's products in certain markets in Europe and beyond." (*Id.* at Ex. H, Voûte Dep. at 107–08.)

modified by Mr. Whitehead, such as in 1999, when, under Mr. Whitehead's direction, Taiga started to accept shipments of TTI flavors in concentrated form, flavors that Taiga would then complete at its facilities in Boom, Belgium before selling them. (*See* Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 74–77.) Such modifications also were never memorialized in a formal contract.

Starting in 1998, certain problematic changes began at TTI that led to a reexamination of its commercial relationship with Taiga. First, in 1998, at the behest of Mr. Whitehead, TTI flavorist Brian Hawking was relocated to Ireland to set up a flavor laboratory there, where Mr. Hawking understood that he would be continuing to develop flavors for TTI that would be distributed to European customers through Taiga. Conflicts surfaced between Mr. Hawking and other U.S.-based flavorists at TTI after his relocation, however, with the result being that no new flavor was developed in Ireland for well over a year, despite TTI's maintenance of Mr. Hawking's salary, travel expenses, and laboratory expenses.[8] Second, TTI started to have financial difficulties more generally. In 1999, Ms. Cassels–Smith asked Mr. Massetti for a loan of $175,000 in order to help maintain TTI's financial health and, from April 2000 until June 2001, Mr. Massetti eventually loaned Ms. Cassels–Smith at least another $675,000, all meant for TTI.[9] Mr. Whitehead also loaned TTI $340,000 during this time. Despite these loans, TTI reported a pre-tax loss of $17,000 in 2000, a first in the company's history according to George Cassels–Smith. (*See* Pl.'s Opp. to Taiga S.J. Mot. at Ex. B, George Cassels–Smith ("GCS") Dep. at 175.) It was thus apparent to Ms. Cassels–Smith and Mr. Whitehead that TTI was experiencing major financial trouble and needed to look for ways to regain its profitability. (*See* Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 220 ("the company was going down and we had reached the point where we couldn't borrow any more from the bank"); *id.* at Ex. I, Whitehead Dep. at 45 (acknowledging TTI's "cash flow issues" in 2000); *see also id.* at Ex. A, Cravotta Dep. at 47 (stating that TTI had many financial problems during the year 2000).)

Accordingly, starting in early 2000, Mr. Whitehead began to negotiate a new arrangement between TTI and Taiga that would relieve TTI of expenses related to the Ireland laboratory and guarantee it a continued income stream from Taiga, while enabling Taiga to expand its business. Under the new arrangement, first proposed at a February meeting among Mr. Whitehead, Mr. Massetti, and Mr. Voûte, TTI would allow Taiga to seek tobacco customers in more countries to which to market tobacco flavors (though TTI would still maintain exclusive accounts with a handful of large tobacco companies), and would further allow Taiga to begin to produce its own tobacco flavors at its facilities in Belgium that would be its sole property. In return, Taiga would continue to purchase and resell TTI flavors, providing TTI with commissions on all TTI flavors it sold, though it would now be free to pay TTI only for the cost of raw materials bought from TTI for the new flavors it created, if those flavors contained at least 30% TTI products. If those new flavors contained less than 30% TTI products, Taiga would be required to pay TTI a percentage commission, which varied according to the percentage of TTI products in

---

**8.** As a later TTI president, Thomas Cravotta, would admit, maintaining Brian Hawking in Ireland was therefore "a drain on the company" that did not appear to have "any benefit for TTI." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. A, Cravotta Dep. at 45.)

**9.** This is a substantial sum, given that TTI's before-tax profit in 1999 was $677,000.

the flavor.[10] This new arrangement, memorialized in notes by Mr. Voûte, will be referred to as the Proposed Agreement.[11] (Pl.'s Opp. to Taiga S.J. Mot. at Ex. O, Proposed Agreement.)

In a later meeting in August of 2000 between Mr. Whitehead and Mr. Voûte, two additional modifications to the TTI–Taiga commercial relationship were proposed, and this new modified arrangement was agreed upon. First, TTI agreed to allow Taiga to use Mr. Hawking to develop its new tobacco flavors. In return, Taiga would pay for all of Mr. Hawking's expenses related to his laboratory, and eventually begin to offer Mr. Hawking an independent stream of compensation (to compensate in part for a planned reduction in his salary by TTI).[12] Second, the method of calculating TTI commissions from Taiga sales was changed. Under the previous arrangement, TTI received a percentage commission based on Taiga's sale price for the flavors it sold. Under the new arrangement, TTI would receive a percentage commission based on the cost of raw materials bought from TTI that were used in the flavors Taiga sold. This

more elaborate arrangement, also memorialized in notes by Mr. Voûte, will be referred to as the Final Agreement. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. M, Final Agreement.) Both Mr. Voûte and Mr. Whitehead remember this late 2000 agreement as being the Final Agreement between the two companies. (*Id.* at Ex. H, Voûte Dep. at 112 & 115–16; *id.* at Ex. I, Whitehead Dep. at 40.)

Because of the new employment arrangement with Brian Hawking, the Final Agreement created the possibility of more competition for TTI for its tobacco flavors, but also relieved TTI of much of the immediate expense of maintaining its Ireland laboratory at a time when TTI needed to cut costs quickly. Also, because of the new commission arrangement, the Final Agreement created more unpredictability for TTI in the amount of revenue it received from each Taiga flavor sale, but this unpredictability was balanced by a steadier—and potentially wider—stream of revenue for TTI from Taiga, since TTI would now be paid for sales of both TTI flavors and new Taiga flavors, some in new markets.[13]

10. If the flavor contained 15–30% TTI key bases, TTI would receive a 5% commission. If the flavor contained 0–15% TTI key bases, TTI would receive a 10% commission. And if the flavor contained no TTI key bases, TTI would receive a 15% commission.

11. It is clear from a contemporaneous email from Mr. Whitehead to both Messrs. Massetti and Voûte that this initial proposal for the new arrangement was not actually agreed upon in any enforceable way. In that email, Mr. Whitehead writes, "No agreements were reached with several ideas remaining on the table.... Till such time as a total agreement is achieved, the business relationship will remain unchanged." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. O, 3/2/00 Whitehead Email.)

12. At the time, according to Mr. Voûte, the Ireland laboratory was costing TTI $160,000 per year, and TTI was only selling Taiga approximately $200,000 worth of goods (of

which only a portion was profit to TTI). (Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 140.)

13. Under the previous arrangement, if a Taiga flavor sold for $100, and TTI received a 15% commission on the sale price, TTI would receive $15 for that sale. Under the new arrangement, TTI would only receive its commission from the portion of that $100 that accounts for raw material costs. Raw materials in a Taiga flavor may account for anywhere from 5% to 70% of the flavor's selling price. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 265–66). Thus, under the new arrangement, if a Taiga flavor sold for $100 and 5%—or $5—of that price accounted for raw material costs, TTI had the ability to make at most $0.75 profit from the flavor's sale (where $0.75 represents a 15% commission on the raw material cost of $5). Of course, if a Taiga flavor sold for $100 and 70%—or $70—of that price accounted for raw

Both companies appear to have abided by the Final Agreement for about three years, but during these years internal problems continued at TTI. In March of 2003, Mr. Whitehead and Mr. Massetti resigned from TTI's board after a financial restructuring proposal made by Mr. Whitehead—one that included a 20% pay cut for himself among other measures—was rejected by Ms. Cassels–Smith, who threatened to fire them if a counter-proposal made by her son was not agreed upon. Brian Hawking was terminated from his position with TTI on March 4, 2003, and his employment ended at the end of that month. Soon thereafter Mr. Whitehead stepped down as president of TTI and left the company. George Cassels–Smith then took over as president and CEO of TTI, positions he holds to this day.[14]

On March 9, 2005, Mr. Voûte sent a letter to TTI in which he informed TTI of Taiga's intention to cease existing commercial relations with TTI in three months' time, and further stated that Taiga would be transferring immediately its commissions—"calculated in the usual way"—to TTI's account. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. V.) Then on April 11, Mr. Voûte sent a follow-up letter to TTI that contained commissions calculated according to raw material costs. TTI claims this was the first time it learned of this commission arrangement. On June 14, five days after commercial relations between TTI and Taiga formally ended, counsel for TTI responded to the April 11 letter and informed Mr. Voûte that his justification for the commission calculations—i.e., the Final Agreement—was a material breach of what TTI's leadership now understood to be the controlling agreement between the two companies—i.e., the Proposed Agreement. This lawsuit followed on March 3, 2006.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Fed. R. Civ. Pro. 56(c). The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judg-

---

material costs, then TTI had the ability to make up to $10.50 profit from the flavor's sale (again assuming a 15% commission). Hence, the new arrangement replaced a fixed commission income for a particular sale at a set price with a range of potential commission incomes for a sale at that price.

While it is true that the new commission calculation method appears to reduce TTI's potential earnings on each Taiga sale, it must be remembered that TTI also received a profit when Taiga first bought the flavors for resale. Because Taiga was expected to use TTI products in its new flavors, TTI stood to make more frequent sales to Taiga, and thus more profits at this stage of the TTI–Taiga transac-

tion; accordingly, the potential for sales of TTI products to Taiga would increase with every new flavor Taiga created. In short, under the new arrangement, Taiga would be able to market its own flavors, but no matter whether a company bought a TTI flavor or a new Taiga flavor, TTI would receive revenue from the sale.

**14.** TTI also elevated two other employees to the posts of "President of TTI USA" and "President, TTI Asia Pacific" (Pl.'s Opp. to Taiga S.J. Mot. at Ex. B, GCS Dep. at 18), an arrangement that Ms. Cassels–Smith refers to as a "triumvirate." (*Id.* at Ex. C, JCS Dep. at 81.)

ment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### A. Validity of Either the Proposed Agreement or the Final Agreement

Before proceeding to the merits of TTI's claims of breach and misappropriation, two central questions must be answered. The first is the question of which agreement controlled the commercial relationship between TTI and Taiga from 2000 until 2005, when commercial relations ended. The determination of this question affects both the reach of the applicable statute of limitations and the viability of TTI's contract-related claims.

TTI claims that the Proposed Agreement, discussed in February 2000, is a valid and binding contract between TTI and Taiga, and that the Final Agreement, discussed in August 2000, is not. It asserts that the Proposed Agreement controls because it, unlike the alleged Final Agreement, was ratified by Ms. Cassels–Smith in her capacity as chairwoman of the board. Without ratification by Ms. Cassels–Smith, it argues, the Final Agreement could not have been binding on TTI, because Mr. Whitehead had neither actual nor apparent authority on his own to enter into the Final Agreement with Taiga on TTI's behalf. Further, TTI argues that the Final Agreement is neither fair nor reasonable to TTI, making it void or voidable under Maryland's interested director statute, Md. Code Ann., Corps. & Ass'ns § 2–419. All of TTI's claims of breach turn on the status of the Proposed Agreement as the controlling agreement.

Upon reviewing the record, the court finds little evidence to support TTI's claim that its chairwoman ratified the Proposed Agreement, and no evidence that ratification by the chairwoman of the board was even a prerequisite for binding agreements at TTI.[15] Accordingly, the binding nature

---

**15.** When Ms. Cassels–Smith was asked during deposition whether she was "regularly ratifying decisions Ron Whitehead made in his role as the TTI employee and president that is in charge of the Taiga relationship," she answered, "I don't know. I don't know what decisions there were. I would imagine if there were any important decisions, I would have been consulted." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 136.) Consultation is of course legally distinct from required ratification. *Compare* Black's Law Dictionary 335 (8th ed. 2004) (defining "consultation" as "[t]he act of asking the advice or opinion of someone") *with id.* at 1290 (defining "ratification," in the contract context, as "binding adoption of an act already completed"). Furthermore, when Ms. Cassels–Smith was asked about the Proposed Agreement in particular, she could not recall having ratified it (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 166); indeed, she could not recall any board ratification of agreements between TTI and Taiga. (*Id.* at 159.) Problematically for

no

of either the Proposed Agreement or the Final Agreement cannot be judged on the basis of ratification.[16]

■ Evidence that Mr. Whitehead had no actual or apparent authority to bind TTI to the Final Agreement with Taiga is similarly lacking. Presidents of corporations generally are presumed to have the actual authority to enter into contracts on their corporation's behalf. *See E. Shore Brokerage & Comm'n Co. v. Harrison*, 141 Md. 91, 118 A. 192, 195–96 (1922) (general or managing officer); *Hagerstown Brewing Co. v. Gates*, 117 Md. 348, 83 A. 570, 574 (1912) ("In the absence of any provision to the contrary contained in the charter of a corporation, it will be presumed that its president, secretary, and treasurer have the authority to make all necessary contracts in transacting the ordinary business of the corporation, within the legitimate scope, object, and purpose of its organization.") (internal quotations and citation omitted); *see also* 2A Fletcher Cyc. Corp. § 559; 18B Am. Jur.2d Corps. § 1337. In this case, Mr. Whitehead had a practice of entering into contracts on TTI's behalf—contracts such as that controlling TTI's purchase of property for the Ireland laboratory—with no further action required by TTI's board. TTI can point to

no provision in its bylaws that limits this contracting authority, and when asked during her deposition whether Mr. Whitehead "had the authority to enter agreements on behalf of TTI as president," TTI's chairwoman answered that "[h]e may have had that authority." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 54; *cf. id.* at Ex. B, GCS Dep. at 171 ("Ron did negotiate on behalf of TTI, unbeknownst to TTI, and I guess did make an agreement. And my mother did ratify it, reluctantly, because Ron does have the authority to do that.").) TTI claims that Ms. Cassels–Smith limited Mr. Whitehead's authority after she learned of the Proposed Agreement by telling him, in her capacity as CEO, "From now on, George [Cassels–Smith] is to accompany you on all these trips, and you are not to make decisions like that again." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 150.) However, this alleged directive was never presented to or approved by the board, and TTI's bylaws do not confer upon the CEO the authority to issue directives that are binding on the president.[17]

■ That Mr. Whitehead had actual authority to enter into the Final Agreement for TTI is thus uncontroverted by the evidence.[18] To find otherwise, in light of the

TTI, to the extent that Ms. Cassels–Smith did recall having ratified a particular agreement, it appears to have been the Final Agreement. When asked whether Exhibit C of the complaint (Mr. Voûte's notes from the August 2000 meeting) "reflect[ed] the terms of the deal that ... the complaint says Ms. Cassels–Smith ratified," Ms. Cassels–Smith replied, "I believe it does...." (*Id.* at 168.) In light of the above testimony, the court cannot conclude that TTI ratification was required for a TTI–Taiga agreement to be binding.

16. This conclusion is bolstered by the fact that the Final Agreement (or the Proposed Agreement, for that matter) is a modification of the original agreement between Taiga and TTI, formed in the 1990s. Since there is no evidence that the original agreement to sell and resell goods was ratified, any subsequent

modification of that agreement cannot be found invalid due to lack of ratification without declaring the original agreement invalid.

17. Nor do they confer this authority upon the chairwoman of the board. (*See* Taiga S.J. Mot. at App. 130, TTI Bylaws Art. III, § 2 (limiting the chairwoman's authority to "implementation" of board-determined policies and "administration of [ ] business affairs").)

18. At the very least, Mr. Whitehead's actual authority was implied from both the actions of TTI's board, which never took steps to limit his ability to enter into binding agreements, and the actions of Ms. Cassels–Smith as chairwoman, who admittedly "kept at arm's length" from his executive decisions and acquiesced to agreements he made on behalf of

absence of a board ratification requirement or other limitation on Mr. Whitehead's authority in this regard, would necessitate a finding that the Proposed Agreement was invalid as well, defeating TTI's breach of contract claim.[19]

■■■ Even if Mr. Whitehead's actual authority could be disputed, there is no question that he had apparent authority as TTI's agent[20] to bind TTI to agreements such as the Final Agreement. "An agent is imbued with apparent authority to bind his or her principal if a third person could reasonably interpret acts or omissions of the principal as indicating that the agent has authority to act on behalf of the principal." *Crothers v. Commodity Futures Trading Comm'n*, 33 F.3d 405, 410 (4th Cir.1994) (internal quotations, citation, and alteration omitted). A corporate president, in particular, "is clothed with apparent authority where the corporation permits that officer to habitually act for the corporation in making contracts or doing other acts, or to manage the business generally, although no authority may have been expressly conferred upon that officer." 2A Fletcher Cyc. Corp. § 595 (internal footnote omitted). Assessment of whether the corporation so permitted is done by examining the acts of the principal, not the agent. *Integrated Consulting Servs., Inc. v. LDDS Comm'cns, Inc.*, 996 F.Supp. 470, 476 (D.Md.1998).

The record shows that TTI regularly permitted Mr. Whitehead to act for the corporation in executing agreements and doing other acts. For instance, Mr. Whitehead set up the initial commercial relationship between TTI and Taiga with no objection from TTI, as Ms. Cassels–Smith concedes. (*See* Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 135; *id.* at 131 (acknowledging that Mr. Whitehead did

---

TTI even when she found them troubling. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. C, JCS Dep. at 136; First Amended Compl. ¶ 13.) *See* 12 Williston on Contracts § 35:67 ("Implied authority may also arise from a course of conduct showing that a principal has repeatedly acquiesced in and adopted acts of the same kind.").

**19.** TTI claims that the Final Agreement, unlike the Proposed Agreement, was an "extraordinary transaction," making it unenforceable despite any actual authority Mr. Whitehead possessed to enter into agreements on TTI's behalf as a general matter. The doctrine of "extraordinary transactions" holds that a corporate president only has authority to bind her corporation to agreements that would arise in the ordinary course of business, and not to agreements that are extraordinary, such as lifetime employment contracts or sales of the corporation's sole asset. *See Lee v. Jenkins Bros.*, 268 F.2d 357, 365–66 (2d Cir.1959). TTI contends that the Final Agreement, insofar as it "give[s] away [TTI's] trade secrets," is an "extraordinary transaction." (Pl.'s Opp. to Taiga S.J. Mot. at 16.)

Upon review of the record, the court disagrees with TTI's characterization of the Final

Agreement as involving misappropriation of trade secrets. There is no evidence other than TTI's allegations that the Final Agreement authorized Mr. Hawking to give away TTI's trade secrets as part of the Final Agreement. Rather, as Mr. Voûte's notes from the agreement show, it allowed Taiga to use Mr. Hawking to develop and produce its own new tobacco flavors. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. M, Final Agreement.) Mr. Hawking's recollection supports this view. (*Id.* at Ex. F, Hawking Dep. at 79.) Accordingly, the agreement does not appear to be an "extraordinary transaction." *Cf. Ullman–Briggs, Inc. v. Salton, Inc.*, 754 F.Supp. 1003, 1006 (S.D.N.Y. 1991).

**20.** Corporate presidents are generally understood to be agents of the corporation they serve. *See* 18B Am.Jur.2d Corporations § 1329 ("It is said that the president of a corporation is the head and general agent of the corporation and may act for it in matters that are within the corporation's ordinary course of business or incidental to it"); *cf. Attorney Grievance Comm'n of Maryland v. Davis*, 379 Md. 361, 842 A.2d 26, 39 (2004) (assuming that a company's president was its agent).

not have to seek board approval before deciding to make Taiga a distributor of TTI products).) TTI also allowed Mr. Whitehead to make other commercial decisions for the corporation, such as the establishment of the Ireland laboratory and the choice to negotiate the Proposed Agreement. Based on these actions and Mr. Whitehead's status as TTI's president, the court finds his apparent authority to be beyond dispute.

Furthermore, it was reasonable for Taiga's officers to assume, from their multiple interactions with Mr. Whitehead [21], that he had apparent authority to act on behalf of TTI. *Cf. Lockwood v. Wolf Corp.*, 629 F.2d 603, 608–09 (9th Cir.1980); 19 C.J.S. Corporations § 694 ("one dealing with the president in the usual course of business and within the powers which the president has been accustomed to exercise without objection from the directors has the right to assume that the president has been invested with those powers"). When the words or conduct of a corporation's agent "cause the third party to believe that the principal consents to or has authorized the conduct of the agent," the corporation will be bound by that agent's acts. *Integrated Consulting*, 996 F.Supp. at 475 (quoting *Johns Hopkins Univ. v. Ritter*, 114 Md. App. 77, 689 A.2d 91, 100 (Md.Ct. Spec.App.1996); *see Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 973 (4th Cir.1987)). This is the case whether or not the corporation benefitted from the agent's acts or ratified them, and regardless of the actual understanding between the corporation and its agent. *Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir.1996); *Yohay*, 827 F.2d at 973. Accordingly, even if Mr. Whitehead lacked actual authority, TTI is bound by those agreements into which he entered with Taiga on behalf of TTI in the exercise of his apparent authority, agreements that include the Final Agreement.[22]

For all of the above reasons, the court declares, pursuant to 28 U.S.C. § 2201, that the Final Agreement was a valid and binding agreement, and that the Proposed Agreement was not. Therefore, the Final

**21.** Examples of these interactions include a 1999 email from Mr. Whitehead to Mr. Voûte in which Mr. Whitehead sought to "clearify [sic] the current understanding between Taiga and TTI." (Taiga S.J. Mot. at Dep. Ex. 44.) This email described at length, in declaratory fashion, the nature of the commercial relationship between the two companies. For further examples, see *supra* note 7.

**22.** The present case is readily distinguishable from *Nat'l Mortgage Warehouse, LLC v. Bankers First Mortgage Co.*, 190 F.Supp.2d 774 (D.Md.2002), in which I ruled that a commercial plaintiff could not hold the defendant title insurance underwriter responsible for the acts of its title agents under the apparent authority doctrine. *Nat'l Mortgage Warehouse, LLC*, 190 F.Supp.2d at 780–82. In that case, there was no standing legal authority suggesting that title agents are generally assumed to have the apparent authority to act as agents of title insurance underwriters, and so it was incumbent upon the plaintiff to use at least reasonable diligence and prudence to ascertain the nature and extent of the title agent's authority. *See id.* at 781; *Standard Acc. Ins. Co. v. Simpson*, 64 F.2d 583, 589 (4th Cir.1933). Here, as previously discussed, the starting presumption at law is that a corporate president has the apparent authority to enter into binding agreements on behalf of the corporation. Thus it was reasonable for Taiga's officers to presume that Mr. Whitehead had the authority to enter into commercial arrangements with Taiga on behalf of TTI, particularly given their history of repeated business transactions with him; no further inquiry into his authority was needed. *See First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md.App. 97, 838 A.2d 404, 458–59 (Md.Ct. Spec.App.2003) (finding it reasonable for plaintiff to believe that bank officer had authority to bind bank to a particular service agreement based in part on the facts that (a) the officer was the bank's senior vice president and (b) the officer had previously negotiated agreements with the plaintiff on behalf of the bank).

Agreement controls in this dispute. *Cf.* Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 112 & 115–16; *id.* at Ex. I, Whitehead Dep. at 40 (recollections of Mr. Voûte and Mr. Whitehead that the Final Agreement, not the Proposed Agreement, was the one to which they were bound.) Because the Final Agreement controls, Taiga cannot be found to have breached the Proposed Agreement. Accordingly, TTI's breach of contract claim fails as a matter of law, as do TTI's related claims that Taiga and Mr. Massetti breached their fiduciary duties by failing to disclose the breach of the Proposed Agreement. (First Amend. Compl. ¶¶ 62(a) & 68(a).)

### i. *Implications of Interested Directors on Final Agreement's Validity*

■ TTI maintains that, even if the Final Agreement is technically valid and binding, it is void or voidable under Maryland's interested director statute. Under this statute, if a corporation enters into an agreement with another corporation "in which any of its directors is a director or has a material financial interest," that agreement is not void or voidable so long as either (1) the fact of common directorship is disclosed to the board of directors or the relevant committee "and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum"; or (2) the agreement is "fair and reasonable to the corporation." Md. Code Ann., Corps. & Ass'ns § 2–419(a)–(b). TTI first argues that "it is undisputed that the [Final Agreement] was not disclosed to, or known by, the disinterested TTI directors" until discovery, and that it was never approved by those directors. (Pl.'s Opp. to Taiga S.J. Mot. at 25.) It then argues that the agreement is not "fair and reasonable to the corporation." Assuming without deciding that the former argument holds, the

court finds that the latter argument does not.

■■ To be deemed "fair," the material terms of an agreement must be "within the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length with knowledge of all material facts known to any party to the transaction." *Indep. Distribs., Inc. v. Katz,* 99 Md.App. 441, 637 A.2d 886, 893 (Md.Ct.Spec.App.1994) (internal quotation and citation omitted). To be deemed "reasonable," it must make sense for the corporation to enter into the agreement. *Id.* The burden is on Taiga to show the fairness and reasonableness of the Final Agreement at the time it was entered into. Md. Code Ann., Corps. & Ass'ns § 2–419(d)(1). This they have adequately done. First, Mr. Whitehead, Ms. Cassels–Smith, and Mr. Massetti all testified during discovery that they viewed the Final Agreement as fair and reasonable to TTI at the time. Mr. Whitehead explained why he thought it was a fair and reasonable transaction in this way: "We were saving a lot of money, at the same time we had potential to make what I thought would be a lot of money either by selling raw materials for the production of Taiga's formulas or, if not that, in the commission that we would receive from them." (Pl.'s Opp. to Taiga S.J. Mot. at Ex. I, Whitehead Dep. at 74; *cf. id.* at Ex. C, JCS Dep. at 159 (recalling that Mr. Whitehead thought the Final Agreement was a good deal for TTI); *id.* at Ex. G, Massetti Dep. at 96 ("according to what I was told by both presidents [Whitehead and Voûte], that deal was going to help both companies at a time they needed it desperately").) This description suggests that the Final Agreement was one to which an economically motivated disinterested person might agree, and further suggests that it made sense for TTI to enter into it as both a

cost-saving measure and a potential income-generating measure. Ms. Cassels–Smith stated that, because of the Final Agreement, "Taiga was helping out and taking some of the burden off us." (*Id.* at Ex. C, JCS Dep. at 276.), and Mr. Massetti, the dual TTI/Taiga director involved in the initial negotiations toward the Final Agreement, stated that he did not think the agreement was unfair or unreasonable to TTI "[b]ecause at the time they were in severe financial trouble. This [agreement] relieved expenses that they had been incurring in Ireland, and they were still going to get an income no matter which direction the sale was made in Europe." (*Id.* at Ex. G, Massetti Dep. at 93; *see id.* at 118 & 217.)

Second, the Final Agreement appears to this court to be fair and reasonable at the time it was entered into based on the undisputed material facts now before it. The timing of the agreement is critical here: at the time the Final Agreement was entered into, TTI was experiencing financial losses, operating to a great extent on borrowed income, paying expenses for a laboratory and laboratory employee that were generating no benefit to it, and faced with few short term measures for reducing its costs. While the Final Agreement may not have been the ideal business decision for TTI, it certainly cannot be deemed unfair or unreasonable under the circumstances TTI faced in 2000. Accordingly, I do not find the Final Agreement to be void or voidable under Maryland's interested director statute.

### B. Effect of Statute of Limitations on TTI's Claims

The second question to be answered before proceeding to the merits of the remaining claims is the effect of Maryland's three-year statute of limitations for civil actions on the claims asserted here. Md. Code Ann., Cts. & Jud. Proc. § 5–101. Defendants continue to assert that TTI's claims in Counts I through V are time-barred because they were brought on March 3, 2006, even though the wrongs complained of occurred no later than 2002.

Pursuant to Maryland's discovery rule, the three-year statute of limitations begins to run from the moment a plaintiff "in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677, 680 (1981); *see Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768, 771 (4th Cir.1995) (citing *Poffenberger*). Under Maryland's "continuation of events" theory, if a continuous relationship exists between the parties, the statute of limitations is tolled until the relationship ends (in this case, June 9, 2005), unless the plaintiff sooner knew or reasonably should have known of the injury or harm. *Frederick Rd. Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 756 A.2d 963, 974–75 (2000). Therefore, if defendants can show that TTI had actual or inquiry notice of its claims over three years before March 3, 2006, TTI's claims cannot be sustained.

It is a principle of agency law in Maryland that "notice to an officer or agent is notice to the corporation where the officer or agent in the line of his duty ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation." *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 635 A.2d 394, 405 (1994) (internal quotations and citation omitted). This "rule of imputation" generally applies unless it can be shown that "the agent's interests are sufficiently adverse to the principal's interests." *Martin Marietta,* 70 F.3d at 772. Accordingly, because Mr. Whitehead was acting as TTI's president (and thus its agent) at the time the Final Agreement was made, actual notice is imputed to TTI unless TTI can show that Mr. Whitehead's interests were

sufficiently adverse to TTI's interests at the time he made the agreement.

To successfully show adversity of interest, TTI must establish that Mr. Whitehead's interests were *completely* adverse to TTI's at the time he made the agreement. *Id.* at 773; *see Robinson v. GEO Licensing Co., LLC*, 173 F.Supp.2d 419, 424 (D.Md.2001) (explaining that adversity must be determined at the time the knowledge is acquired). It is not enough, therefore, for TTI to show that Mr. Whitehead had more than simply TTI's interests at heart when he entered into the Final Agreement. *See Martin Marietta*, 70 F.3d at 773. It must show, rather, that Mr. Whitehead had "totally abandoned the principal's interest and [was] acting for his own purposes or those of another" at the time. *Id.; see* Restatement (Third) of Agency § 5.04 (2006) (precluding imputation when an agent "intend[s] to act solely for the agent's own purposes or those of another person").

In my previous memorandum opinion in this case, I found the question of Mr. Whitehead's adversity of interest to be sufficiently close to warrant surviving a motion to dismiss. With the benefit of discovery, however, I find that the facts now show Mr. Whitehead did not totally abandon TTI's interest and act solely for his own purposes at the time he entered into the Final Agreement. As discussed at length above, the Final Agreement contained many features that Mr. Whitehead justifiably thought would improve TTI's troubled financial situation. Accordingly, notice of the Final Agreement may be imputed to TTI.

Imputation of notice to TTI is further supported by the fact that TTI accepted benefits from the Final Agreement. Even when an agent displays complete adversity of interest to his principal, the knowledge he obtains may be imputed to the principal when the principal has "knowingly retained a benefit from the agent's action." Restatement (Third) of Agency § 5.04 (2006). TTI admits that it retained the benefit of Taiga's payment of commissions to TTI from the Final Agreement approximating $30,000. (Pl.'s Opp. to Taiga S.J. Mot. at Ex. B, GCS Dep. at 672.) It also admits that it accepted at least $50–$60,000 from Taiga between December 2000 and 2002 for costs associated with the Ireland laboratory, such as Mr. Hawking's salary. (*Id.* at 658–59.) This knowing receipt of payments from Taiga, some of which were solely the product of the Final Agreement and not the Proposed Agreement or any prior agreement (i.e., the payments related to the Ireland laboratory), precludes TTI from claiming it lacked notice of the Final Agreement until 2005.

Because TTI had imputed notice of the Final Agreement in 2000, many of its remaining claims are time-barred. Nearly all of the non-misappropriation claims raised against Mr. Massetti in Count III are time-barred, as they stem directly from Mr. Massetti's actions concerning the Final Agreement. (*See* First Amend. Compl. ¶ 68(a), (b), (d), (e) & (i).) TTI's claim that Mr. Massetti breached his director's duty by "directing Cravotta not to question the merits of TTI's relationship with Taiga" (First Amend. Compl. ¶ 68(f)), besides failing to state a cognizable legal claim, is also time-barred, since it refers to an exchange that TTI admits happened between two of its own officers in 2000. (*See* First Amend. Compl. ¶¶ 8–10.) Also time-barred is TTI's claim that Mr. Massetti breached his director's duty by "directing Taiga to lump together its sales figures for tobacco and nontobacco flavors so as to prevent TTI from being able to estimate the amount of commissions it was due." (First Amend. Compl. ¶ 68(g).) This claim refers to a financial reporting decision made on June 3, 2002 (Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at

289; *see* First Amend. Compl. ¶ 36), implemented at the start of 2003 (*id.* at 300), and about which TTI would have had inquiry notice by late January or early February 2003 at the latest, given that the change affected financial statements that were disseminated to Taiga's shareholders—including several TTI board members—each month.[23] (*Id.* at 302–03.) All of TTI's remaining non-misappropriation claims against Taiga and Mr. Voûte in Counts II and IV are also time-barred. These include its claim of breach of duty related to the Final Agreement, as well as its claims of aiding and abetting Mr. Massetti's alleged breaches of duty. (First Amend. Compl. ¶¶ 62(b), 74, 75, & 76.)

Finally, the misappropriation claims in Count V are time-barred, because TTI had imputed notice of the alleged misappropriation by virtue of having imputed notice of the Final Agreement that authorized it. Indeed, all of the alleged acts of misappropriation about which TTI complains were, by its own description, carried out pursuant to the Final Agreement. *See, e.g.*, First Amend. Compl. ¶ 85 (describing the misappropriation in this way: "Through their unauthorized 'Final Agreement,' the defendants conspired with Whitehead to have him secretly . . . direct Hawking to . . . ignore his fiduciary duty to[ ] TTI and to create for, and disclose to, Taiga tobacco-flavor formulas about which TTI would know nothing.") Furthermore, all of the alleged acts of misappropriation happened prior to March 3, 2003, putting them outside the reach of this court, as the present complaint was filed on March 3, 2006. (*See* Pl.'s Opp. to Taiga S.J. Mot. at Ex. F, Hawking Dep. at 79 (Mr. Hawking remembering that Mr. Whitehead instructed him in November 2000 to create and send to Taiga flavors for Taiga's customers); *cf. id.* at 112 (Mr. Hawking verifying that he was terminated by TTI on Monday, March 4, 2003).)

▮ Even assuming the alleged misappropriation happened within the limitations period, the misappropriation claims fail because the Hawking-created formulas Taiga acquired were its own property, and moreover were acquired only after express authorization from TTI's president. In Maryland, misappropriation claims are controlled by the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11–1201 *et seq.* According to the Act, misappropriation means the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [the][d]isclosure or use of a trade secret of another without express or implied consent." *Id.* § 11–1201(c)(1)–(2). Because the Final Agreement explicitly authorized Taiga to use Brian Hawking to create new flavors that would be its sole property, the disputed flavor formulas are not trade secrets "of another." (*Cf.* Pl.'s Opp. to Taiga S.J. Mot. at Ex. F, Hawking Dep. at 107 (Mr. Hawking not recalling having made any flavor formulas for TTI between 2000 and 2003).) Likewise, this explicit authorization—both in the Final

---

**23.** Furthermore, even if this claim were not time-barred, TTI has pointed to no evidence showing that the offending reporting decision was an unlawful or negligent act. Indeed, it appears that, previous to the decision, Taiga had been reporting more financial information than was necessary under Belgian law. (*See* Pl.'s Opp. to Taiga S.J. Mot. at Ex. H, Voûte Dep. at 291.) The new decision appears to have altered the contents of financial reports in ways that still conformed with Belgian law and accepted practice; TTI has not suggested otherwise. Because a director cannot be held liable simply for advising a corporation to take lawful but arguably suboptimal actions, this claim would likely fail. *See* 3A Fletcher Cyc. Corp. § 1029 ("Courts apply the [director] duty of care in cases involving alleged negligence, mismanagement, or intentional decisions to commit unlawful acts.").

Agreement and in subsequent directives from Mr. Whitehead to Mr. Hawking (*see id.* at 79; *id.* at 87–88)—forecloses an allegation of misappropriation based on use of a trade secret by Taiga and Mr. Voûte "without express or implied consent." *See LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 849 A.2d 451, 466 (2004) (for purposes of the Maryland Uniform Trade Secrets Act, acquiring something by "improper means" includes taking it without authority to do so). For all of the above reasons, TTI's misappropriation claims against Taiga and Mr. Voûte fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment will be granted. A separate Order follows.

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Plaintiff's motion for leave to file first amended complaint (docket entry no. 104) shall be **DENIED in part and GRANTED in part**;

   a. This motion shall be **DENIED** with respect to First Amended Complaint ¶ 68(c) & (h), and First Amended Complaint ¶¶ 82 through 85 (Count V), insofar as they include defendant Thomas J. Massetti;

   b. This motion shall be **GRANTED** with respect to all remaining amendments;

2. Plaintiff's motions to seal (docket entry nos. 113 & 127) are **GRANTED;**

3. Defendants' motions for summary judgment (docket entry nos. 117 & 119) are **GRANTED;**

4. Judgment is entered in favor of the defendants; and

5. The Clerk shall **CLOSE** this case.