**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 09-1690**

---

TOBACCO TECHNOLOGY, INCORPORATED,

        Plaintiff - Appellant,

    v.

TAIGA INTERNATIONAL N.V.; THOMAS J. MASSETTI; MARIE-PAUL
VOUTE,

        Defendants - Appellees.

---

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Catherine C. Blake, District Judge.
(1:06-cv-00563-CCB)

---

Argued: May 13, 2010             Decided: July 20, 2010

---

Before DUNCAN and KEENAN, Circuit Judges, and Arthur L. ALARCÓN,
Senior Circuit Judge of the United States Court of Appeals for
the Ninth Circuit, sitting by designation.

---

Affirmed by unpublished opinion. Judge Duncan wrote the
opinion, in which Judge Keenan and Senior Judge Alarcón joined.

---

**ARGUED:** Thomas Matthew Wilson, III, TYDINGS & ROSENBERG, LLP,
Baltimore, Maryland, for Appellant. David B. Salmons, BINGHAM &
MCCUTCHEN, LLP, Washington, D.C., for Appellees. **ON BRIEF:**
Gregory M. Garrett, TYDINGS & ROSENBERG, LLP, Baltimore,
Maryland, for Appellant. Stanley J. Reed, William A. Goldberg,
LERCH, EARLY & BREWER, CHTD., Bethesda, Maryland, for Appellee
Thomas J. Massetti; Boyd T. Cloern, Bryan M. Killian, BINGHAM &

MCCUTCHEN, LLP, Washington, D.C., for Appellees Taiga International N.V. and Marie-Paul Voûte.

_____

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises from a district court's grant of summary judgment finding that the appellant's breach of contract claims failed as a matter of law and that its tort-based claims of breach of fiduciary duties were time-barred. For the reasons that follow, we affirm.

## I.

"Because this appeal is from an order granting summary judgment, we recite the facts in the light most favorable to the non-moving party." Garofolo v. Donald B. Heslep Assocs., 405 F.3d 194, 195 (4th Cir. 2005).

## A.

Appellant Tobacco Technology International, Inc. ("TTI") is a closely held Maryland corporation founded in the 1970s. It manufactures and distributes flavoring ingredients for use in tobacco products. When its founder and president Duke Cassels-Smith died in 1987, the presidency and a majority of the stock transferred to his widow, Jeremy Cassels-Smith ("Ms. Cassels-Smith"). Because of her lack of managerial experience, Ms. Cassels-Smith hired Ronald Whitehead ("Whitehead") to be TTI's president in 1991. Whitehead was also made a director. Ms.

Cassels-Smith assumed the title of chairwoman of the board, to which the title of CEO was later added.

TTI's bylaws provided that Whitehead, as president, had "the responsibility for the active management of the business and general supervision and direction of all of the affairs of the Corporation." J.A. 612. The bylaws also gave Whitehead the express authority "to execute any documents requiring the signature of an executive officer." Id. Throughout his tenure, Whitehead exercised this authority to enter into contracts on TTI's behalf, and, as acknowledged by Ms. Cassels-Smith, did so without any oversight from TTI's board of directors. By contrast, Ms. Cassels-Smith's own positions conferred no substantive responsibilities. Her role, in her own words, was that of a "[n]ag" who "just wanted to be kept informed about everything." J.A. 153.

Although the bylaws did not limit Whitehead's ability to manage TTI's affairs, he did sign a nondisclosure agreement that prohibited disclosure of its proprietary information. Part 3.B. of the agreement provided in part that Whitehead could not, without written consent of the board of directors,

> disclose to others, or appropriate to his own use or the use of others, any confidential information of TTI. All information, regardless whether written, pertaining to TTI's business, including, without limitation, information regarding customers, prospective customers, customer lists, costs, prices, pricing lists, earnings, products, product lists,

4

> formulae, research and development, compositions, machines, apparatus, systems, procedures, prospective and executed contracts and other business arrangements, and sources of supply are presumed to be confidential information of TTI for purposes of this Agreement.

J.A. 627 (emphasis added). Subject to the nondisclosure agreement, Whitehead ran TTI's affairs until his departure in 2003.[1] He conducted the day-to-day business of the company, including entering into formal contracts and purchasing facilities, without the input of Ms. Cassels-Smith or any other officer or director of TTI. One of Whitehead's responsibilities as president was the management of TTI's relationship with Appellee Taiga International, N.V. ("Taiga").

Taiga is a closely held Belgian corporation formed in 1992 with the aid of several TTI directors -- including Whitehead and Ms. Cassels-Smith -- who became partial owners in their individual capacities. Also contributing to its formation were Thomas Massetti ("Massetti"), a fellow TTI director and the CEO of Craftmaster Flavor Technology, Inc. ("Craftmaster"), which produced flavoring ingredients for food products, and his

---

[1] When Whitehead left TTI in March 2003, he was replaced as president by Ms. Cassels-Smith's son, George Cassels-Smith ("George Cassels-Smith").

longtime business associate, Marie-Paul Voûte ("Voûte").[2] Taiga's purpose was to serve as a distributor of both Craftmaster's and TTI's products in Europe. Upon its formation, Massetti was appointed its president, and Voûte its general manager. These two individuals thereafter assumed day-to-day control of Taiga's operations.

In its first few years of operation, Taiga focused on distributing its food-flavoring products in conjunction with Craftmaster. Then, in 1996, Taiga entered into an arrangement with TTI for the distribution of TTI's tobacco-flavoring products. This arrangement was not formalized in a written contract, but was informally managed by Whitehead, Massetti, and Voûte. Under the initial 1996 arrangement, Taiga would purchase TTI's flavoring ingredients at a profit to TTI, then repackage the flavoring ingredients with its own finishing ingredients and distribute the final product in Europe as a Taiga product. Taiga would then make a second payment to TTI in the form of a percentage commission of the final sale price. Taiga could only sell its products in countries where TTI was not directly selling its own products, and Taiga was prohibited from producing tobacco flavoring ingredients.

---

[2] Massetti and Voûte, together with Taiga, are the defendants in this litigation.

A couple of years after the 1996 initial agreement, TTI entered a period of financial difficulty. The difficulties began in 1998, when Whitehead transferred one of TTI's flavor-chemists, Brian Hawking, from the United States to Ireland, and provided him a laboratory.[3] Despite the payment of substantial sums for Hawking's laboratory and salary, Hawking developed no flavors for TTI. As described by one TTI officer and director, Hawking and his laboratory were "a drain on the company" that did not provide "any benefit for TTI." J.A. 550. This drain contributed to the overall decline in TTI's financial health between 1998 and 2000. Notes from an April 1999 TTI board meeting state that "the cash flow for 1998 and 1999 is tight." J.A. 690. Also, from 1999 to 2000, TTI's pre-tax profits fell from a $677,000 gain to a $17,000 loss. During that same period, TTI borrowed over a million dollars from Massetti and Whitehead, and also came within forty-eight hours of declaring bankruptcy before being rescued by an influx of private capital from other directors. Although George Cassels-Smith was later to opine that TTI's financial position during this time was "beautiful," J.A. 356, Ms. Cassels-Smith acknowledged these financial difficulties, stating that TTI was "losing business

---

[3] Hawking's employment contract contained a nondisclosure provision identical to Whitehead's.

7

hand over fist," J.A. 186, was "constantly borrowing from Peter to pay Paul," J.A. 189, and was "going downhill in a toboggan," J.A. 269. Other TTI officers and directors echoed this view.[4]

While TTI was experiencing financial troubles, Whitehead sought to negotiate changes to TTI's 1996 initial agreement with Taiga. These efforts occurred on two separate occasions.[5]

First, in February 2000, Whitehead agreed with Massetti and Voûte to several modifications to the arrangement. We will refer to this revised agreement as the "Proposed Agreement."[6] Under the Proposed Agreement, Taiga could develop its own flavors for use in finished tobacco products and market those products in European countries where TTI was selling its own products directly. In exchange, Taiga would continue to purchase TTI's flavoring ingredients and pay commissions on them. The three individuals further agreed to change the method

---

[4] For example, Thomas Cravotta, who was a Vice President of TTI in 1998, admitted that "in the period around 2000 TTI was experiencing financial difficulties." J.A. 551. Massetti further noted that as of August 2000, TTI was "in serious financial trouble." J.A. 290.

[5] Like the 1996 initial agreement, these modifications were not formalized in written contracts.

[6] TTI has dubbed this agreement the "London Proposal," presumably because Whitehead met with Massetti and Voute in London to discuss it. For ease of reference, however, we have adopted the district court's terminology.

for calculating the commissions that Taiga would pay to TTI. Under the Proposed Agreement, Taiga would pay TTI only for the raw cost of TTI's flavoring ingredients if the final Taiga product comprised more than 30 percent of TTI's ingredients. If the final product comprised less than 30 percent of TTI's flavoring ingredients, Taiga continued to pay TTI a percentage commission.

Whitehead informed the Cassels-Smiths of the terms of the Proposed Agreement. Recognizing that Whitehead had the authority to negotiate on behalf of TTI, Ms. Cassels-Smith agreed to its terms. She told Whitehead, however, that she wanted George Cassels-Smith to be a part of any further decisions on TTI's behalf regarding the arrangement with Taiga.[7]

Despite Ms. Cassels-Smith's request, Whitehead proceeded alone in August 2000 to finalize the agreement with Massetti and Voûte. The "Final Agreement" adopted the modifications agreed upon in the Proposed Agreement and added two additional components.[8] First, Whitehead agreed to allocate Hawking to Taiga to develop flavors. In exchange, Taiga would assume TTI's

---

[7] The record is unclear as to the position George Cassels-Smith held during the year 2000.

[8] TTI refers to the Final Agreement as the "2000 Transaction." Again, we adopt the district court's terminology.

9

financial responsibility for Hawking's laboratory and associated costs, and would gradually supply Hawking independent compensation as TTI concomitantly reduced his salary. Taiga would continue to purchase TTI products and would pay commissions to TTI on all products containing either a TTI flavor or a Taiga flavor developed by Hawking. Second, Whitehead agreed to another change to the methodology for computing TTI's commissions. Whereas previously the commission was based on the final sale price of the Taiga product, now it would be based on the percentage of TTI materials incorporated into the product.[9]

After the Final Agreement was reached, Hawking created sixty-nine new flavors for Taiga. Taiga paid TTI commissions on

_____

[9] This new arrangement created more variability in the amount that TTI could expect to profit on commissions. As the district court explained,

> Under the previous arrangement, if a Taiga flavor sold for $100, and TTI received a 15% commission on the sale price, TTI would receive $15 for that sale. Under the new arrangement, TTI would only receive its commission from the portion of that $100 that accounts for raw material costs. Raw materials in a Taiga flavor may account for anywhere from 5% to 70% of the flavors selling price.

Tobacco Tech., Inc. v. Taiga Int'l N.V., 626 F. Supp. 2d 537, 544 n.13 (D. Md. 2009). Accordingly, TTI could receive 15 percent of anywhere from 5 to 70 percent of the sale price -- here, from ¢75 to $10.50. Id.

10

these flavors, and also paid TTI for the expenses associated with Hawking's laboratory.

In March 2003, George Cassels-Smith became president of TTI. In March 2005, Taiga informed TTI that it was ending their relationship. Taiga then attempted to remit a payment to TTI for TTI's flavoring ingredients, which Taiga computed under the terms of the Final Agreement. TTI objected to this payment, arguing that under the terms of the agreement it believed to control the relationship, the Proposed Agreement, Taiga had not paid enough. Taiga responded that the Final Agreement controlled the relationship, not the Proposed Agreement, and that its payment was correctly calculated. TTI then claimed that it had never heard of the Final Agreement and that it was invalid. After an unsuccessful effort to resolve the differences over which agreement controlled, TTI commenced the present litigation.

B.

In March 2006, TTI filed a five-count complaint against Taiga, Massetti, and Voûte in the United States District Court for the District of Maryland. In Count I, TTI alleged a breach of contract by Taiga, in that Taiga had failed to abide by the terms of the controlling agreement between the parties, the Proposed Agreement. In Count II, TTI alleged a breach of a

11

fiduciary duty by Taiga, in that Taiga had failed to disclose the existence of the Final Agreement to TTI. In Count III, TTI alleged a breach of a director's duty by Massetti, for failing to disclose the existence of the Final Agreement to TTI while serving as a TTI director. In Count IV, TTI alleged that Taiga and Voûte aided and abetted Massetti's breach of fiduciary duties. In Count V, TTI alleged a misappropriation of trade secrets by Taiga and Voûte, by obtaining and using flavors that Hawking developed after the Final Agreement. TTI thereafter filed an amended complaint adding a Count VI, in which it sought a declaration that the Final Agreement was invalid.

The defendants filed two summary judgment motions, one by Massetti and one by Taiga and Voûte, challenging all counts. Ultimately, the district court granted defendants' motions. First, the district court rejected TTI's argument that the Final Agreement was invalid and therefore could not control the relationship between TTI and Taiga. The district court disagreed with TTI that Whitehead either lacked the authority as TTI's agent to enter into the Final Agreement, or that it was not saved from being void or voidable under Maryland's Interested-Director Statute, Md. Code Ann., Corps. & Ass'ns § 2-419. Consequently, the district court found Counts I and VI

12

failed as a matter of law, as well as components of Counts II and III.[10]

As to TTI's tort claims, the district court determined that they had not been timely filed, and were thus barred. In doing so, the district court rejected TTI's argument that the limitations period was tolled because Whitehead's knowledge of the Final Agreement could not be imputed to it. Accordingly, the district court granted summary judgment to Taiga, Massetti, and Voûte on all claims.

TTI now appeals, challenging the district court's determinations on Counts II through VI.

II.

We "review[] a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court." Pueschel v. Peters, 577 F.3d 558, 563 (4th

---

[10] Count II alleges that Taiga breached fiduciary duties to TTI, and states three different claims of breach. First among these is that Taiga "fail[ed] to disclose and actively conceal[ed]" the breach of the Proposed Agreement. J.A. 79. Similarly, in Count III, TTI alleges that Massetti breached his fiduciary duties to TTI, and states nine different claims for breach. First among these is that Massetti "fail[ed] to disclose the breaches of contract" by not telling TTI that Taiga was operating under the terms of the allegedly invalid Final Agreement. J.A. 81. Upon finding that the Final Agreement was valid, the district court found that these claims failed along with the contract claims in Counts I and VI.

13

Cir. 2009). "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 600 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)). When a case involves our diversity jurisdiction, we apply the law that would have been applied by the state court in the state where the district court sits. Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 599-600 (4th Cir. 2004). Neither party disputes that Maryland's substantive law controls, so we apply it here. See Am. Hot Rod Ass'n, Inc. v. Carrier, 500 F.2d 1269, 1277 n.5 (4th Cir. 1974) (declining to apply substantive law other than that of the state in which the district court sat, because no argument for applying different substantive law was made to the district court).

### III.

On appeal, TTI challenges each of the district court's determinations: that the Final Agreement controlled the relationship between TTI and Taiga, and that the remaining tort claims are time-barred. We address both arguments below.

14

A.

We begin with TTI's contention that the district court erred by determining that the Final Agreement controls the relationship between TTI and Taiga. TTI advances alternative arguments in this regard. First, it contends that the Final Agreement is invalid because Whitehead lacked authority to agree to it on TTI's behalf. Second, TTI contends that the Final Agreement is an interested-director transaction that cannot be saved from being void or voidable by the statutory safe harbor provided in Maryland's interested-director statute, Md. Code. Ann., Corps. & Ass'ns § 2-419(b)(2).

1.

We first address the question of Whitehead's authority to bind TTI in the Final Agreement. Under Maryland law, "[a]n agent's authority to act must come from the principal." Progressive Cas. Ins. Co. v. Ehrhardt, 518 A.2d 151, 155 (Md. Ct. Spec. App. 1986). "[T]he authority conferred upon the agent by the principal can take two forms: actual authority or apparent authority." Id. A person can be deemed an agent based

on either.[11]  Jackson v. 2109 Brandywine, LLC, 952 A.2d 304, 322 (Md. Ct. Spec. App. 2008).

"Actual authority is that which is actually granted by the principal to the agent, and it may be express or implied." Homa v. Friendly Mobile Manor, 612 A.2d 322, 333 (Md. Ct. Spec. App. 1992).    Express   authority   is   conferred   by   an   "express appointment and acceptance thereof." Med. Mut. Liab. Ins. Soc'y of Md. v. Mut. Fire, Marine & Inland Ins. Co., 379 A.2d 739 (Md. App. 1977).   Implied authority is derived "from the words and conduct of the parties and the circumstances." Id.

We   begin   with   express   authority.    As a general matter, Whitehead enjoyed a broad grant of express authority under TTI's bylaws,   which   gave   him   "the   responsibility   for   the   active management of the business and general supervision and direction of all of the affairs of the Corporation." J.A. 612.   Moreover, the bylaws gave Whitehead the "express authority to execute on TTI's   behalf   any   documents   requiring   the   signature   of   an executive   officer."    Id.    Throughout   his   tenure,   Whitehead

_____

[11] TTI argues that Whitehead lacked both actual and apparent authority.    As we have said, a person can be deemed an agent based on either form.  Jackson, 952 A.2d at 322.   Because TTI fails to demonstrate that Whitehead lacked actual authority -- in either express or implied form -- we do not reach its argument regarding Whitehead's apparent authority.

16

exercised this authority to enter into contracts on behalf of TTI. As Ms. Cassels-Smith acknowledged, Whitehead was able to do so without needing any approval from its board of directors. Perhaps for these reasons, TTI does not argue that Whitehead lacked authority to agree to the Final Agreement because he had no power to form agreements on his own. Rather, TTI makes a narrower argument, contending that Whitehead exceeded the scope of his express authority because he contravened the scope of his nondisclosure agreement, which delimited his express authority in a key respect. Specifically, TTI argues that by agreeing to have Hawking produce flavors for Taiga while Hawking remained on TTI's payroll, Whitehead disclosed TTI's "trade secrets" in contravention of his nondisclosure agreement's prohibition that he not disclose TTI's "confidential information" without its written consent. J.A. 627. As a necessary threshold premise to this argument, TTI contends that all flavors developed by Hawking while he remained on its payroll were its own trade secrets. We do not agree with this premise.

In Maryland, the law of trade secrets gives a person a property interest in his trade secret. See Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc., 639 A.2d 173, 180 (Md. Ct. Spec. App. 1994) (noting that "confidential business information constitutes property of the company and . . . its premature and improper disclosure can constitute a

17

misappropriation of corporate property); see also Carpenter v. United States, 484 U.S. 19, 26 (1987) ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit." (internal quotations omitted)). The interest is in "information" that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." LeJeune v. Coin Acceptors, Inc., 849 A.2d 451, 459 (Md. 2004) (quoting Md. Code Ann., Comm. Law § 11-1201(e)). The subject matter of a trade secret

> may be an industrial secret like a secret machine, process, or formula, or it may be industrial know-how (an increasingly important ancillary of patented inventions); it may be information of any sort; it may be an idea of a scientific nature, or of a literary nature or it may be a slogan or suggestion for a method of advertising; lastly, the subject-matter may be the product of work, or expenditure of money, or of trial and error, or the expenditure of time.

Bond v. Polycycle, Inc., 732 A.2d 970, 973 (Md. Ct. Spec. App. 1999) (internal quotations omitted).

As an initial point, TTI is correct that Whitehead's nondisclosure agreement placed a limit on his general contracting authority by prohibiting him from disclosing

18

information that would constitute its trade secrets. The nondisclosure agreement prevented Whitehead from disclosing "confidential information," which is defined as "[a]ll information, regardless whether written, pertaining to TTI's business, including, without limitation, information regarding customers, prospective customers, customer lists, costs, prices, pricing lists, earnings, products, product lists, formulae, research and development, compositions, machines, apparatus, systems, procedures, prospective and executed contracts and other business arrangements, and sources of supply . . . ." J.A. 627. The issue, however, is whether Whitehead disclosed <u>any</u> information that could constitute a trade secret in the Final Agreement. As we explain, he did not.

Under Maryland law, for Whitehead to have bargained away TTI's trade secrets, he must have bargained away TTI's property, in the form of information worthy of concealment from competitors that TTI had developed and possessed. <u>LeJeune</u>, 849 A.2d at 459. While the information in question could be defined quite broadly, <u>see</u> <u>Bond</u>, 732 A.2d at 973, it must have been possible for TTI to withhold it. Yet, TTI concedes that Hawking had not developed any flavors at the time of the Final Agreement. Further, TTI does not contend that the sixty-nine flavors at issue were "products" or "formulae" that existed as ideas in Hawking's mind at the time of the Final Agreement. <u>See</u>

19

Oral Arg. Tr. ("The asset that was given away was flavors that had yet to be developed . . . . There was no agreement to give away flavors that had been developed prior to that time."). Accordingly, it is undisputed that these flavors did not exist in any form, written or unwritten, when Whitehead agreed to the Final Agreement. While true that TTI employed Hawking for the purpose of developing flavors, trade secrets-law could only protect the flavors that Hawking had developed for TTI -- to any extent -- at the time of the Final Agreement. See Alleco, 639 A.2d at 180; see also Carpenter, 484 U.S. at 26. As Hawking had created nothing for TTI while working in Ireland prior to the Final Agreement, there were no trade secrets for Whitehead to bargain away.[12] Thus, we find that TTI has failed to show that Whitehead lacked express authority to enter into the Final Agreement.

We now consider implied authority. Here, we have little difficulty disposing of TTI's argument, for it is essentially a

---

[12] TTI raises a secondary argument that Whitehead breached his nondisclosure agreement because he suborned Hawking to violate Hawking's own nondisclosure agreement. For the reasons we have provided, Whitehead did not. Hawking was not compelled by the Final Agreement to give Taiga any secrets that he possessed in the form of research or development of any flavors. Rather, he was allocated to Taiga for the purpose of creating new as-yet-to-be-created flavors for them. Whatever concerns may have been raised by this allocation, they did not implicate the misappropriation of trade secrets.

20

recasting of the argument against Whitehead's express authority. TTI's argument on this point relies on the case of <u>Bortner v. J.C. Leib Co., Inc.</u>, where the Maryland Court of Appeals held that an agent who gives away the principal's property engages in an "extraordinary transaction" that exceeds the scope of the agent's implied authority. 126 A. 890, 896 (Md. 1924). Here, TTI contends that Whitehead similarly engaged in an extraordinary transaction because he bargained away its trade secrets. We are not persuaded.

Assuming without deciding that an agent who bargains away his principal's trade secrets engages in an extraordinary transaction, TTI has failed to demonstrate that Whitehead bargained away trade secrets here, for reasons already discussed. Instead, TTI has put forward a circular argument: it contends that the sixty-nine flavors Hawking developed are its own trade secrets because the Final Agreement is void as an extraordinary transaction, but then argues that the Final Agreement is extraordinary because it provided Taiga with TTI's trade secrets. In this, TTI again presumes an answer to the threshold question whether Whitehead bargained away trade secrets when he agreed to have Hawking develop flavors for Taiga. As he did not, there is no basis to believe the Final Agreement is an extraordinary transaction.

21

Accordingly, we find that TTI has failed to show that Whitehead lacked actual authority to act as TTI's agent when he agreed to the terms of the Final Agreement.

2.

We next address whether Maryland's interested-director statute, Md. Code Ann., Corps & Ass'ns § 2-419(b), applies to the Final Agreement. This statute creates a safe harbor provision under which a transaction entered into by a director who has a conflict of interest is not void or voidable if "the contract or transaction is fair and reasonable." Id. § 2-419(b)(2). It is undisputed that Whitehead had a conflict of interest because he was a director of both TTI and Taiga when he agreed to the Final Agreement. Accordingly, the only issue is whether the Final Agreement is fair and reasonable.[13] TTI

---

[13] TTI also argues that the Final Agreement is void or voidable because, despite his conflict of interest, Whitehead took steps to prevent TTI's other directors from learning of the Final Agreement when he ignored Ms. Cassels-Smith's request that George Cassels-Smith be included in any discussions with Taiga after the Proposed Agreement. This argument invokes the other provision of section 2-419(b), which provides that an interested-director transaction is not void or voidable if the board of directors is informed of the transaction and ratifies it. Whatever the merit of this contention may be, it is irrelevant to our determination.

Section 2-419(b) provides two statutory safe harbors for interested-director transactions. Under section 2-419(b)(1), a
(Continued)

22

contends that it was not because Whitehead allowed Taiga to obtain intellectual property worth millions of dollars, as well as broader distribution powers, in exchange for unneeded assistance for Hawking and a new method of calculating commissions that provided TTI little remuneration.[14]   We find this argument unpersuasive.

Under section 2-419(b)(2), an agreement is "fair" if the terms are "within the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length with knowledge of all material facts known to any party to the transaction."   Indep. Distribs., Inc. v. Katz, 637

_____

transaction involving a conflict of interest is not void or voidable if the fact of common directorship or interest is disclosed or known to the board of directors and the board ratifies the contract or transaction. See Md. Code Ann., Corps & Ass'ns §§ 2-419(b)(1) and b(1)(i).  Under section 2-419(b)(2), such a transaction is not void or voidable if, by its terms, it is fair and reasonable to the corporation.  These two safe harbors are disjunctive, which is probably why the district court assumed the former provision could not apply and held exclusively on the latter.  See Tobacco Tech., 626 F. Supp. 2d at 550.  We agree with the district court: regardless of any merit to an argument under section 2-419(b)(1), the transaction is not void or voidable if it satisfies section 2-419(b)(2).  As we confine our analysis to the latter provision, and find that the Final Agreement satisfies its terms, we do not consider the former.

[14] TTI also renews its argument that Whitehead bargained away its trade secrets.  Nothing more need be said about this contention.

23

A.2d 886, 893 (Md. Ct. Spec. App. 1994) (internal quotations and citation omitted).  The agreement is "reasonable," if "it makes sense" for the corporation to have entered into it.  Id.  Based on the undisputed facts, the Final Agreement is both fair and reasonable.

First, the terms of the Final Agreement are fair to TTI. TTI allocated Hawking to Taiga, and in exchange Taiga agreed to pay TTI for Hawking's laboratory and promised to take on his salary obligation gradually.  TTI also agreed to a method of calculating commissions that provided less predictability in terms of how much income it would receive, but for which the pool that commissions could be collected from had been expanded both to include products containing TTI's flavors -- which Taiga promised to keep buying -- and Taiga's flavors, as well as to draw commissions from the larger pool of European countries where Taiga would now sell flavors.  In light of the considerations provided by the parties, we cannot say the terms are outside "the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length with knowledge of all material facts known to any party to the transaction."  Id.

Second, in light of TTI's financial circumstances at that time, it was reasonable for Whitehead to agree to the Final Agreement.  Ms. Cassels-Smith conceded that at the time of the

24

Final Agreement, TTI was "losing business hand over fist." J.A. 186. Other directors similarly admitted that the firm was in bad financial shape. These characterizations are confirmed by the fact that TTI completely lost its profitability from 1999 to 2000, and came within forty-eight hours of declaring bankruptcy despite borrowing over a million dollars from its own directors, Massetti and Whitehead.[15] During this period, TTI held complete financial responsibility for Hawking, which by TTI's concession created a "drain on the company." J.A. 550. In the face of these difficulties, Whitehead negotiated a deal with Massetti and Voûte that gave TTI the chance to obtain commissions from a

---

[15] George Cassels-Smith testified to the contrary, suggesting that TTI's financial position at the time of the Final Agreement was "beautiful." J.A 356. TTI argues that in light of this statement, a genuine issue of material fact as to TTI's financial position exists. George Cassels-Smith's testimony, however, is contrary to the record evidence. For instance, TTI's corporate board minutes from April 1999 state that "the cash flow for 1998 and 1999 [was] tight." J.A. 690. Moreover, every other TTI director to testify on this issue, including Ms. Cassels-Smith, acknowledged the company's financial problems. In light of these facts, we agree with the district court that no genuine issue of material fact existed as to TTI's financial position during this period. George Cassels-Smith's opinion, unsupported by the record, is insufficient to defeat summary judgment. See Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

broader array of countries and from a larger number of products sold by Taiga, and that alleviated the strain of paying for Hawking while still obtaining a benefit from his work. Given the financial difficulties that TTI faced during this time, it "ma[de] sense" for Whitehead to have agreed to the Final Agreement. Katz, 637 A.2d at 893.

Accordingly, because the undisputed facts reflect that the Final Agreement was both fair and reasonable, we find that the safe harbor of section 2-419(b) applies to the circumstances in this case and the Agreement is therefore not void or voidable. TTI has thus failed to demonstrate that the district court erred when finding the Final Agreement to be binding.

B.

We now turn to the final issue, whether the district court erred in finding the balance of TTI's tort-based claims barred by the applicable three-year statute of limitations, Md. Code Ann., Cts & Jud. Proc. § 5-101. TTI concedes that the viability of its remaining claims turns on whether the statute of limitations is tolled, but contends that it should have been. We disagree.

Under Maryland's "discovery rule," a statute of limitations begins to run when the plaintiff "kn[ows] or reasonably should have known of the wrong." Poffenberger v. Risser, 431 A.2d 677,

680 (Md. 1981). Maryland follows the traditional rule that, as between a principal and agent, it is presumed that a principal is charged with the agent's knowledge. Martin Marietta Corp. v. Gould, Inc., 70 F.3d 768, 771 (4th Cir. 1995). However, under the "adverse interest exception" to this rule, a principal may "avoid imputation when the agent's interests are sufficiently adverse" to its own. Id. at 771-72. To make out this exception, the principal bears the burden of showing that "the agent [has] totally abandoned the principal's interest and [is] acting for his own purposes or those of another. In other words, the interests of the agent must be completely adverse to those of his principal." Id. at 773. This is because if the agent is acting both for himself and the principal, "the agent is acting within the scope of the agency relationship, and it is reasonable to assume that the agent will communicate the knowledge to his principal." Id.

We have just held that the Final Agreement was a fair and reasonable transaction for TTI. For the same reasons, we are constrained to find that TTI cannot meet its burden to show that the adverse interest exception applies in this case. Even were we to assume that Whitehead held some interest other than TTI's when he bargained for the Final Agreement, nevertheless he negotiated an agreement that made sense for TTI, particularly at the time. As a result, TTI cannot show that Whitehead acted

27

with "complete adversity" to its own interests, and so is "chargeable with [Whitehead's] knowledge."  Id. at 773.  TTI's tort claims are therefore time-barred.


                              IV.

     For the foregoing reasons, TTI's contract claims fail as a matter of law, and its tort claims are barred by the statute of limitations.  The judgment of the district court is

                                            AFFIRMED.